PD-1333-15
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 10/19/2015 4:48:23 PM
Accepted 10/19/2015 5:02:37 PM
ABEL ACOSTA
CLERK

**CAUSE NO. PD-1333-15**

**IN THE**

**COURT OF CRIMINAL APPEALS**

**OF TEXAS**

---

**THE STATE OF TEXAS,**
**PETITIONER**

**VS.**

**ESAW LAMPKIN,**
**RESPONDENT**

---

**Petition in Cause No. 42.897-B**
**From the 124th Judicial District Court of**
**Gregg County, Texas and**

**The Court of Appeals for the**
**Sixth District of Texas, Cause No. 06-14-00024-CR**

---

**PETITION FOR DISCRETIONARY REVIEW**

---

**L. Charles van Cleef**
**State Bar No. 00786305**
**P.O. Box 2432**
**Longview, Texas 75606-2432**
**903-248-8244 Telephone**
**903-248-8249 Facsimile**
**charles@vancleef.pro**

*ORAL ARGUMENT*
*REQUESTED*

FILED IN
COURT OF CRIMINAL APPEALS

October 19, 2015

ABEL ACOSTA, CLERK

**COUNSEL FOR PETITIONER**

## I. IDENTITY OF JUDGES, PARTIES AND COUNSEL

Hon. Alfonso Charles, Trial Court Judge
124th Judicial District Court in and for Gregg County, Texas

Chief Justice Josh R. Morriss, III, Justice Bailey C. Moseley, and Justice Ralph K. Burgess, Appellate Panel, Sixth Court of Appeals, Texarkana, Texas

Esaw Lampkin, Respondent
Texas Department of Criminal Justice

Brandon T. Winn, Trial Counsel for Appellant
Texas Bar #24070866, 411 West Tyler St., Gilmer, TX 75644

Hough-Lewis ("Lew") Dunn, Appellate Counsel for Respondent
Texas Bar #06244600, 201 E. Methvin, Suite 102, PO Box 2226, Longview, TX 75606

Christopher A. Parker, Trial Counsel for Petitioner
Texas Bar #24046585
Stacey L. Brownlee, Trial Counsel for Petitioner
Texas Bar #09250375
V. Christopher Botto, Trial Counsel for Petitioner
Texas Bar #24064926
Gregg County District Attorney's Office, 101 E. Methvin, Suite 333, Longview, TX 75601

L. Charles van Cleef, Appellate Counsel for Petitioner
Texas Bar #00786305, PO Box 2432, Longview, TX 75606-2432

## II.    TABLE OF CONTENTS

I.   IDENTITY OF JUDGES, PARTIES AND COUNSEL ................................- 2 -

II.  TABLE OF CONTENTS ............................................................- 3 -

III. TABLE OF AUTHORITIES.........................................................- 4 -

IV. STATEMENT REGARDING ORAL ARGUMENT ...................................- 5 -

V.  STATEMENT OF THE CASE .......................................................- 5 -

VI. STATEMENT OF PROCEDURAL HISTORY ...........................................- 6 -

VII. GROUNDS FOR REVIEW .............................................................- 6 -

VIII.    ARGUMENT ......................................................................- 7 -

   A.   New Rules for Deficient Performance? ...................................- 7 -
      1)  The Undiscovered Evidence.........................................- 8 -
      2)  Error to Weigh the Negative Impact of Evidence?.................- 9 -
      3)  The New Rule.......................................................- 10 -
      4)  Burden on the Wrong Party—A Silent Record Benefits the Party with the Burden?..............................................................- 11 -

   B.   Trial Court's Findings and Conclusions Ignored...................- 13 -

IX. CONCLUSION.........................................................................- 14 -

X.  PRAYER FOR RELIEF ...............................................................- 16 -

XI. CERTIFICATE OF SERVICE........................................................- 17 -

XII. CERTIFICATE OF COMPLIANCE ...................................................- 18 -

XIII.    APPENDIX .......................................................................- 19 -

## III. TABLE OF AUTHORITIES

**Cases**

Bone v. State, 77 S.W.3d 828 (Tex.Crim.App.2002)..........................................- 11 -

Goodspeed v. State, 187 S.W.3d 390 (Tex.Crim.App.2005) ..............................- 11 -

Menefield v. State, 363 S.W.3d 591 (Tex.Crim.App.2012)....................- 11 -, - 12 -

Milburn v. State, 15 S.W.3d 267 (Tex.App.—Houston [14th Dist.] 2000, pet. ref'd) ..............................................................................................................- 13 -

Porter v. McCollum, 558 U.S. 30 (2009).........................................................- 13 -

Shanklin v. State, 190 S.W.3d 154 (Tex. App.—Houston [1st Dist.] 2005), *pet. dism'd, improvidently granted*, 211 S.W.3d 315 (Tex. Crim. App. 2007)......- 13 -

Strickland v. Washington, 466 U.S. 668  (1984).......................... - 11 -, - 12 -, - 13 -

Wiggins v. Smith, 539 U.S. 510 (2003).....................................................- 9 -, - 13 -

**TO THE HONORABLE JUSTICES OF SAID COURT:**

Comes now the STATE OF TEXAS, Petitioner herein, and files this, its Petition for Discretionary Review. In support thereof, Petitioner shows the Court the following:

## IV. STATEMENT REGARDING ORAL ARGUMENT

In the event this petition is granted, Petitioner requests oral argument. Argument would assist the Court because resolution of the ground for review depends upon a detailed exploration of the facts of this case and the law used by the Court of Appeals in its decision. Further, oral argument would provide this Court with an opportunity to question the parties regarding their positions.

## V. STATEMENT OF THE CASE

The respondent was charged with driving while intoxicated, a third or more offense, enhanced by two prior felonies. CR 5 (Indictment). A jury found the respondent guilty and, at the conclusion of the punishment phase, the jury assessed a sentence of 99 years. See CR 85-86 (Judgment). The Court held a hearing on a motion for new trial, but denied relief. CR 448-449. Respondent appealed, presenting 14 issues. On August 11, 2015, the Sixth Court of Appeals issued an Opinion denying all but one of the issues. Appendix (Opinion). The respondent filed a motion for rehearing, which the Court denied. The Court of Appeals remanded and ordered resentencing based on a single point of ineffective assistance of counsel.

## VI.   STATEMENT OF PROCEDURAL HISTORY

On August 11, 2015, the Sixth Court of Appeals issued its published Opinion and Judgment affirming the trial court in all but one respect. Appendix. The respondent filed a motion for rehearing on August 21, 2015. That motion was overruled on August 25, 2015.

## VII.   GROUNDS FOR REVIEW

Petitioner respectfully contends that the Sixth Court of Appeals erred in its resolution of the appeal in the following respects and, in its published decision, has created new rules for the evaluation of habeas corpus claims of ineffective assistance of counsel that conflict with established legal principles and the decisions of this Court:

1. The Court of Appeals applied the reverse of the well-settled Strickland burdens of production and proof applicable in habeas corpus claims, expressly basing its decision on the absence of evidence that an attorney performed specified acts of investigation—evidence which the claimant, not the State, must present—then expressly refused to weigh undiscovered evidence in determining whether prejudice occurred.

2. Further, the Court of Appeals failed to use the correct standard of review (abuse of discretion) in evaluating the trial court's findings and conclusions from a hearing on the respondent's motion for new trial and, in fact, expressly gave no credence whatsoever to the trial judge's

findings and conclusions concerning the claim of ineffective assistance of counsel.

## VIII.    ARGUMENT

The Court of Appeals enunciated new standards for analysis of ineffective assistance of counsel claims regarding the discovery and presentation of mitigating evidence that have far reaching consequences for both prosecutors and defense attorneys.  Specifically, the Court of Appeals relied on the absence of evidence of counsel's actions rather than requiring the proponent to present such evidence, did not weigh the aggravating nature of undiscovered mitigating evidence in determining prejudice, and disregarded the trial court's findings and conclusions on these very issues.

### A. NEW RULES FOR DEFICIENT PERFORMANCE?

One of the points raised in the respondent's motion for new trial was that trial counsel was ineffective for failing to request a competency evaluation and hearing due to alleged concerns about the respondent's mental stability and competence. Both the trial court and Court of Appeals determined that trial counsel was not ineffective in this regard.  This argument blossomed into a further argument that trial counsel failed to present what the Court of Appeals labeled "mitigating evidence" in the form of mental health and other records from Respondent's prior incarceration(s), regardless of trial competency.  In essence, the Court of Appeals concluded that if there was any concern over competency then,

even if it is resolved and the case continues, trial counsel must seek out possible evidence of odd behavior or diagnosis to use in mitigation and, further, that it makes no matter whether that evidence is a two-edged sword if, in fact, counsel failed to discover it.

### 1) THE UNDISCOVERED EVIDENCE

During the hearing on the motion for new trial, trial counsel was examined regarding several factors, some of which are discussed below, for determining a defendant's competency. At that time, the respondent had new counsel who obtained the respondent's prison records and questioned numerous witnesses, including several attorneys; he also presented an affidavit of the respondent. The prison records constitute the "undiscovered mitigating evidence" at issue in the relevant portion of the Opinion.

The prison records indicated the respondent had a low IQ, had been evaluated for mental health services and seen a psychiatrist, and contained other, related observations over a several year period ending in 2010. See Appendix at "Appendix" (Court's Summary of Records). The records also indicated malingering, faking a disability, and noncompliance. See Appendix at 69. Trial counsel did not obtain or use these records for purposes of trial, and did not know or have reason to know of their existence.

## 2) ERROR TO WEIGH THE NEGATIVE IMPACT OF EVIDENCE?

The trial court determined that trial counsel was <u>not</u> ineffective because the records, even if trial counsel had them, could not only be argued to provide sympathy for the respondent but could also show that he was a malcontent or malingerer. The Court of Appeals disregarded these findings and conclusions on the basis that since trial counsel did not obtain the records, he could not have made a strategic decision not to present them. <u>Appendix</u> at 70. Having observed that <u>Wiggins v. Smith</u>, 539 U.S. 510 (2003) required weighing the negative impact of mitigation evidence (as the trial court did) and not to presume prejudice, the Court of Appeals, it seems, presumed prejudice. <u>Appendix</u> at 70-71. Relying on a mélange of cases, the Court of Appeals concluded that weighing the positive and negative impact of the undiscovered evidence is error. <u>Appendix</u> at 69-70. The Court of Appeals stated "we find that absent counsel's unprofessional error, Lampkin's mental health records would have been available for the jury to review, and these records could have shed a different light on Lampkin's prior convictions." <u>Appendix</u> at 70. Then, without reference to the trial court's findings regarding the potential negative impact of the records, concluded in the very next sentence of the Opinion, "beyond speculation or conjecture that a reasonable probability exists that Lampkin's sentence would have been less severe had the

mitigating evidence been presented and that the trial court erred in finding otherwise." <u>Appendix</u> at 70-71.

### 3) THE NEW RULE

The Court of Appeals' decision establishes a new and conflicting rule regarding the evaluation of ineffective assistance of counsel claims to the effect that when an attorney fails to obtain such evidence, weighing the evidence is essentially unimportant if <u>any</u> element of the evidence might have been used in mitigation; if true, this case should be cited as an exception to the Supreme Court's decision in <u>Wiggins</u> and leaves prosecutors, defense attorneys, and judges wondering what has happened to the <u>Strickland</u> prejudice prong. The new rule is that undiscovered evidence which tends to be both aggravating and mitigating need only be analyzed for potential mitigating value, and not in its totality—which, it bears repeating, is what the trial court did. This is in contravention to the legal standard which requires, in this context, that the Court of Appeals determine whether there is "a reasonable probability that the result of the proceeding would have been different." <u>See</u> <u>Strickland</u>, 466 U.S. at 687-88.

### 4) BURDEN ON THE WRONG PARTY—A SILENT RECORD BENEFITS THE PARTY WITH THE BURDEN?

In evaluating trial counsel's alleged ineffectiveness in failing to discover and present mitigating evidence of mental health history, the Court of Appeals concluded that "there is no evidence that counsel performed any investigation into Lampkin's mental health history." Appendix at 52. The Court of Appeals observed that there is no evidence that: (1) trial counsel hired an investigator or attempted to speak to any of Lampkin's other relatives; (2) trial counsel attempted to speak with the respondent's wife or other relatives; or (3) trial counsel inquired of jail personnel whether the respondent was receiving or had any type of mental health services in the past. Appendix at 52.

Yet, under Strickland v. Washington, 466 U.S. 668, 687-88 (1984), **the burden is on the defendant**; the correct question should have been whether there was evidence that counsel **did not** do those things.

Claims of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate their merit. Menefield v. State, 363 S.W.3d 591, 592 (Tex.Crim.App.2012); Goodspeed v. State, 187 S.W.3d 390, 392 (Tex.Crim.App.2005). A criminal defendant has the burden of showing by a preponderance of the evidence that his attorney failed to provide constitutionally adequate representation. Bone v. State, 77 S.W.3d 828, 836 (Tex.Crim.App.2002). Limitations of the record often render a direct appeal inadequate to raise a claim of

ineffective assistance of counsel. See Goodspeed, 187 S.W.3d at 392. "An ineffective-assistance claim must be firmly founded in the record and the record must affirmatively demonstrate the meritorious nature of the claim." Menefield, 363 S.W.3d at 592.

Here, the Court of Appeals has posed several question that are not answered by the record, to wit, whether trial counsel hired an investigator, attempted to speak to the respondent's relatives, wife, or jailers in order to discover facts that would have led counsel to request the respondent's TDCJ records. Appendix at 52-53.[1] These instances of "lack of evidence" are the factors that expressly caused the Court of Appeals to conclude that trial counsel failed to investigate for mitigating evidence. Yet, as noted above, there was a hearing on Respondent's motion for new trial and trial counsel, among several other witnesses, was questioned. Respondent did not ask these questions, nor did Respondent present any relatives, Respondent's wife, or any jailer. Respondent, not Petitioner, has the burden in these matters. In analyzing Respondent's claims in this manner, the Court of Appeals shifted the entire burden set forth in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 2063, 80 L.Ed.2d 674 (1984) and its progeny.

Further, in regard to prejudice, the Court of Appeals first observed that prejudice is not presumed when counsel fails to investigate and present available mitigating evidence, Appendix at 62, then considered several factors concerning

---

[1] This lack of evidence morphed into a conclusion that trial counsel did not, in fact, contact Respondent's wife or hire an investigator in the following page of discussion, Appendix at 53.

- 12 -

the existence of prejudice where counsel failed to investigate or present mitigating evidence, citing Milburn v. State, 15 S.W.3d 267 (Tex.App.—Houston [14th Dist.] 2000, pet. ref'd), Wiggins v. Smith, 539 U.S. 510, 537 (2003), Porter v. McCollum, 558 U.S. 30, 42 (2009) (*per curiam*), Shanklin v. State, 190 S.W.3d 154, 165-66 (Tex. App.—Houston [1st Dist.] 2005), *pet. dism'd, improvidently granted*, 211 S.W.3d 315 (Tex. Crim. App. 2007). However, the Court of Appeals ignored the fact that, as it previously observed in the Opinion, trial counsel intended for the respondent's testimony to be mitigating. Respondent's testimony, arguably, did not go well, but it was intended to be mitigating as demonstrated in a letter from trial counsel to Respondent. Appendix at 67-68.

Thus, the Court of Appeals propounded a **new rule** that undiscovered evidence which tends to be both aggravating and mitigating need only be analyzed for potential mitigating value, and not in its totality—which, it bears repeating, is what the trial court did. This is in contravention to the legal standard which requires, in this context, that the Court of Appeals determine whether there is "a reasonable probability that the result of the proceeding would have been different." See Strickland, 466 U.S. at 687-88.

### B. TRIAL COURT'S FINDINGS AND CONCLUSIONS IGNORED

In the Court of Appeals' analysis, discussed directly above, the Court of Appeals gave absolutely no deference to the trial court's findings and conclusions,

despite the fact that these very arguments were presented to the trial court at the hearing on the respondent's motion for new trial. The trial court concluded:

As to not asking for these records. Even if he had had these records, while it could
be argued they may have helped and provided sympathy for Mr. Lampkin, looking
at the back of some of these records also shows -- it could be easily argued, with all the requests and complaints that Mr. Lampkin had while in prison, that he was
a malcontent or malingerer or other things that could actually have hurt Mr. Lampkin, had he gone -- had these records been introduced in front of a jury.

Appendix at 69. There is no mention or analysis of the abuse of discretion standard in this portion of the appellate Opinion; the Court of Appeals held that "the potential harm analysis under these circumstances would not amount to a deferral to the considered strategic decisions of counsel." The Court ignored the trial court's findings regarding aggravating evidence and application of the Strickland standard, as well as the trial court's conclusion that counsel was not ineffective.

## IX.   CONCLUSION

The Court of Appeals' holding presents a new rule; reasonable and short extrapolation of that rule is that when counsel fails to discover and present evidence that may have any hint of mitigation—regardless of whether the evidence would also be aggravating—counsel is *per se* ineffective. The undersigned finds no authority for this new rule, and none is expressly cited by the Court of Appeals.

Without a requirement to show harm in a totality of evidence, it is not possible to reconcile the Court of Appeals' analysis with <u>Strickland</u> and its progeny.

Further, the Court of Appeals shifted the burden of production to the State insofar as the Court of Appeals expressly considered a <u>lack</u> of evidence in the record that defense counsel took certain steps—rather than noting a defendant's burden to produce evidence that defense counsel did not take those steps—to support a conclusion of ineffective assistance of counsel. A silent record, here, benefitted the party with the burden of production and proof. Put simply, a lack of evidence does not equate to "evidence" for the party with the burden of production.

Finally, the Court of Appeals should have given correct deference to the findings, and the conclusion, of the trial court.

## X.  PRAYER FOR RELIEF

In light of the foregoing, Petitioner respectfully requests that the Court of Criminal Appeals grant discretionary review and direct the parties to prepare briefs so the matters summarized herein may be fully considered by the Court.

Respectfully submitted,


/s/ L. Charles van Cleef

_____

L. Charles van Cleef
State Bar No. 00786305

P.O. Box 2432
Longview, Texas 75606-2432
(903) 248-8244 Telephone
(903) 248-8249 Facsimile

COUNSEL FOR PETITIONER

## XI.   CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument has

been forwarded by email/e-filing to all represented parties in accordance with TEX.

R. APP. P. 9.5(b)(1) to:

Hough-Lewis "Lew" Dunn
Attorney at Law
201 E. Methvin, Suite 102
P.O. Box 2226
Longview, TX 75606
dunn@texramp.net

Office of the State Prosecuting Attorney of Texas
P.O. Box 13046
Austin, TX 78711-3046
information@spa.texas.gov
and by Fax: 512-463-5724

on this Thursday, October 15, 2015.

/s/ L. Charles van Cleef

_____
L. Charles van Cleef

## XII.    CERTIFICATE OF COMPLIANCE

In accordance with TEX. R. APP. P. 9..4(i)(3), I hereby certify that the foregoing Petition for Discretionary Review was prepared using Microsoft Word using 14 point type, and that is contains 2,149 words, excluding portions exempted by TEX. R. APP. P. 9.4(i)(1).

/s/ L. Charles van Cleef

_____
L. Charles van Cleef
October 15, 2015

**XIII.   APPENDIX**

Esaw Lampkin v. State of Texas, No. 06-14-00024-CR,
--- S.W.3d ----, 2015 WL 4735664
(Tex.App.—Texarkana, 2015)



# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-14-00024-CR

ESAW LAMPKIN, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 124th District Court
Gregg County, Texas
Trial Court No. 42,897-B

Before Morriss, C.J., Moseley and Burgess, JJ.
Opinion by Justice Burgess

# OPINION

## I.  Introduction

While driving a stolen truck in Gregg County, Texas, Esaw Lampkin caught the attention of a police officer when he backed up on a highway off-ramp, sped through an intersection, and failed to yield to oncoming traffic.  During the lawful traffic stop that followed, Lampkin admitted that he had been drinking alcohol.  A Gregg County district judge executed a warrant authorizing a blood draw against Lampkin's will.  After a jury heard that Lampkin's blood alcohol concentration (BAC) was .111 grams per deciliter, they convicted him of driving while intoxicated (DWI), third or more.  Because the jury also found that Lampkin was previously convicted of two prior felony offenses as alleged in the enhancement paragraphs and heard evidence that he had a substantial criminal history that included eight prior felony convictions, they assessed an enhanced sentence of ninety-nine years' imprisonment.

On appeal, Lampkin argues that the evidence is legally insufficient to support the jury's finding of guilt and that the trial court erred (1) in failing to exclude evidence of his BAC, (2) in failing to suppress evidence obtained in violation of *Miranda v. Arizona*,[1] (3)  in failing to include a jury instruction on the statutory exclusionary rule embodied in Article 38.23 of the Texas Code of Criminal Procedure, (4) in allowing extraneous-offense evidence, and (5) in overruling his motion for a new trial based on various complaints that his counsel rendered ineffective assistance.  Additionally, Lampkin raises new grounds on appeal of alleged ineffective assistance of trial counsel.

---

[1]*See Miranda v. Arizona*, 384 U.S. 436 (1966).

We find that the evidence is sufficient to support the jury's verdict of guilt and that no error or alleged ineffectiveness of counsel impacted the guilt/innocence portion of Lampkin's trial. However, we also find that the trial court erred in failing to grant Lampkin a new trial on punishment due to trial counsel's ineffective assistance in failing to investigate and present mitigating evidence. Accordingly, we reverse the trial court's judgment and remand the matter to the trial court for a new trial on punishment only.

## II. Lampkin's General Points of Error

### A. The Evidence Was Legally Sufficient to Support the Jury's Verdict of Guilt

#### 1. Evidence of Lampkin's Intoxication

Joe Cassin, a deputy with the Gregg County Sheriff's Office, testified that at 10:27 p.m., he saw Lampkin "backing up towards the interstate on the actual exit ramp itself." According to Cassin, Lampkin then accelerated through an intersection and failed to yield to oncoming traffic. After witnessing these traffic violations, Cassin initiated a traffic stop and made contact with Lampkin, who could not produce a driver's license.[2]

Cassin testified that he immediately noticed that the truck's cabin smelled of alcohol and that Lampkin had slurred speech and bloodshot eyes. While being recorded (both audio and video) by the dashboard camera (dash cam) in Cassin's patrol car, Lampkin informed Cassin that he had consumed one beer. After hearing this admission, Cassin asked Lampkin to step outside of the vehicle and discovered that the smell of alcohol was emanating from Lampkin's person, not the

---

[2]The record establishes that the truck Lampkin was driving had been stolen and that Lampkin had already been placed under arrest for the stolen truck before the DWI investigation began. Yet, prior to Lampkin's trial, the State agreed not to mention that the truck was stolen.

vehicle. Cassin's testimony and the recording of the arrest demonstrated that Lampkin was unsteady on his feet and that his speech was slurred.

Cassin called Bobby Dean, a trooper with the Texas Department of Public Safety (TDPS), to assist in a DWI investigation. Cassin testified, "I advised [Lampkin] of his rights, asked him if he understood his rights, and he shook his head up and down in the affirmative and said yes." The recording of the arrest confirms that Cassin read Lampkin the *Miranda* warnings in Dean's presence before Dean's interrogation.

At trial, Dean testified that Lampkin had red, glassy eyes and that his breath smelled of alcohol. Over an objection, Dean testified that Lampkin initially admitted to drinking one sixteen-ounce beer, but that "he changed his answer from one to three 16-ounce beers." According to Dean, Lampkin exhibited four out of six cues during the Horizontal-Gaze Nystagmus Test (HGN Test). Dean testified, "I asked [Lampkin] to describe how he felt on a scale of 0 to 10, if 0 was completely sober and 10 is the most intoxicated he had ever heard of anybody being, and he told me he was a 5." A second recording, taken from the dash cam in Dean's patrol car, corroborated Dean's testimony and memorialized Lampkin's agreement with Dean that he might be intoxicated.

After this admission, Dean placed Lampkin in his patrol car. The dash cam footage from inside the patrol car included close-up footage of Lampkin's face as he delivered a lengthy rant raising several complaints about Dean's methods of interrogation. As a result, the jury was able

4

to see Lampkin's face clearly and hear his slurred speech. While being recorded, Lampkin threatened to file a formal complaint against Dean for racial profiling.[3]

After Lampkin refused to voluntarily submit to a blood test, Dean transported him to Good Shepherd Medical Center and obtained a warrant for a nurse to draw his blood. Karen Ream, a TDPS forensic scientist, testified that Lampkin's BAC was .111 approximately two hours and nineteen minutes after the traffic stop.

Based on this evidence, the jury rendered a guilty verdict. Lampkin contends that the jury's verdict is not supported by sufficient evidence.

### 2.     Standard of Review

In evaluating legal sufficiency, we review all the evidence in the light most favorable to the jury's verdict to determine whether any rational jury could have found the essential elements of DWI beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd) (citing *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007)). Our rigorous legal sufficiency review focuses on the quality of the evidence presented. *Brooks*, 323 S.W.3d at 917–18 (Cochran, J., concurring). We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the jury "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences

---

[3]We only mention this fact because it is the basis of one of Lampkin's points of error alleging ineffective assistance of counsel.

5

from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19).

Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). The hypothetically correct jury charge "sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id.* Under a hypothetically correct jury charge, Lampkin committed the offense of DWI, third or more, if (1) he (2) operated (3) a motor vehicle (4) in a public place (5) while intoxicated and (6) had previously been convicted two times of any other DWI offense.[4] *See* Tex. Penal Code Ann. §§ 49.04(a), 49.09(b)(2) (West Supp. 2014).

Lampkin challenges only the intoxication element. Under Section 49.01(2) of the Texas Penal Code, a person is intoxicated if he does not have "the normal use of mental or physical faculties by reason of the introduction of alcohol . . . , or ha[s] an alcohol concentration of 0.08 or more." Tex. Penal Code Ann. § 49.01(2) (West 2011). The trial court submitted both definitions of intoxication to the jury.

### 3. Analysis

Pointing to evidence of his low IQ, which was not before the jury at trial, Lampkin argues that Dean and Cassin tricked him into admitting that he was intoxicated and that he had ingested

---

[4]Lampkin entered pleas of "true" to the two prior DWI convictions after he discussed the matter with his attorney and heard the trial court's admonishments as to the effect of such pleas.

three beers. Even putting Lampkin's admissions aside, legally sufficient evidence established Lampkin's intoxication. Cassin stopped Lampkin after witnessing Lampkin commit a number of unusual moving traffic violations in rapid succession. Dean and Cassin testified that Lampkin smelled of alcohol and had red, glassy, bloodshot eyes. Although Lampkin's mental health records indicate that his typical speech patterns are normal, the evidence at trial established that Lampkin's speech was slurred at the time of his arrest. Lampkin exhibited four out of six cues during the HGN Test, his BAC was .111 two hours and nineteen minutes after his arrest, Lampkin admitted he had consumed more than one sixteen-ounce beer before driving, and he rated himself a five out of ten on a hypothetical intoxication scale where zero was not intoxicated and ten was the highest level of intoxication possible. Dean and Cassin both told the jury that their independent conclusions that Lampkin was intoxicated were based on their training and experience as police officers and on the facts and circumstances with which they were confronted. The jury was able to reach their own conclusions by observing Lampkin's behavior and slurred speech through the two dash cam recordings of the stop and subsequent interaction.

We find that legally sufficient evidence supports the jury's guilty verdict. Accordingly, we overrule Lampkin's first point of error.

**B.      The Trial Court Did Not Abuse its Discretion in Admitting Lampkin's BAC**

Lampkin argues on appeal that the trial court erred in admitting evidence concerning his BAC in the absence of retrograde extrapolation evidence. We disagree.

7

## 1. Standard of Review

"We review a trial court's ruling under the Rules of Evidence for an abuse of discretion." *Billodeau v. State*, 277 S.W.3d 34, 39 (Tex. Crim. App. 2009). "We consider the ruling in light of what was before the trial court at the time the ruling was made and uphold the trial court's judgment if it lies within the zone of reasonable disagreement." *Id*. "If the trial judge was correct under any theory of law applicable to the case, we will uphold the judge's decision." *Bowley v. State*, 310 S.W.3d 431, 434 (Tex. Crim. App. 2010).

## 2. Analysis

In support of his argument to the trial court that his BAC was irrelevant absent evidence of retrograde extrapolation, Lampkin relied on *Mata v. State*, 46 S.W.3d 902, 910 (Tex. Crim. App. 2001), arguing that this case stands "for the proposition that evidence like this is not probative once a blood draw exceeds two hours without having an extrapolation expert." Lampkin's reading of this and similar cases is simply incorrect.

In *Mata*, the Texas Court of Criminal Appeals specifically stated that it was not addressing the issue of "whether test results showing a defendant's BAC at some time after the alleged offense [are] admissible at trial in the absence of retrograde extrapolation." *Mata*, 46 S.W.3d at 910. Instead, the sole issue addressed in *Mata* was whether an expert witness "reliably applied the science of retrograde extrapolation" in Mata's trial. Similarly, both *Burns and Bagheri*, cases referenced in Lampkin's appellate brief, merely held that the retrograde extrapolation evidence offered at trial in those specific cases was unreliable. *Bagheri v. State*, 119 S.W.3d 755, 756–57

8

(Tex. Crim. App. 2003); *Burns v. State*, 298 S.W.3d 697, 702 (Tex. App.—San Antonio 2009, pet. ref'd).

None of the cases cited by Lampkin stand for the proposition that the admissibility of BAC evidence is dependent upon the inclusion or exclusion of retrograde extrapolation evidence, even if the defendant's blood is drawn two or more hours after the arrest. *See Bagheri*, 119 S.W.3d at 760–61. Rather, Texas courts have specifically held that retrograde extrapolation is not required to establish the admissibility of BAC evidence. *Kirsch v. State*, 306 S.W.3d 738, 743–47 (Tex. Crim. App. 2010); *Stewart v. State*, 129 S.W.3d 93, 96–97 (Tex. Crim. App. 2004) (en banc); *see Phillips v. Tex. Dep't of Pub. Safety*, 362 S.W.3d 252, 257 (Tex. App.—Beaumont 2012, no pet.) (citing *Mireles v. Tex. Dep't Pub. Safety*, 9 S.W.3d 128, 132 (Tex. 1999) (per curiam)); *Garcia v. State*, 112 S.W.3d 839, 849–50 (Tex. App.—Houston [14th Dist.] 2003, no pet.).

Here, Lampkin's BAC was probative of the issue of whether he was intoxicated at the time of the alleged offense. *See Garcia*, 112 S.W.3d at 850; *Stewart*, 129 S.W.3d at 96. Lampkin's argument that the blood test was taken over two hours after the arrest is an argument as to the weight of the evidence, not its admissibility. *Garcia*, 112 S.W.3d at 851 (finding no error in trial court's decision to admit BAC evidence derived from blood drawn two hours after offense in absence of retrograde extrapolation evidence). Because the Texas Court of Criminal Appeals has held that the admissibility of BAC evidence is not dependent on the inclusion or exclusion of retrograde extrapolation evidence, we conclude that the trial court did not abuse its discretion in overruling Lampkin's objection. Accordingly, we overrule Lampkin's second point of error.

9

**C.** **The Trial Court Properly Denied Lampkin's Motion to Suppress his Statements to Trooper Dean**

Lampkin sought to suppress evidence of the oral statements and admissions he made to Dean during the DWI investigation. Lampkin contends that he did not waive his *Miranda* rights and that his statements to Dean were involuntary. Thus, he argues, the trial court's decision not to to suppress his custodial statements constituted an abuse of discretion.

**1.** **Standard of Review**

The trial court is the "'sole and exclusive trier of fact and judge of the credibility'" and weight of the evidence presented at a hearing on a motion to suppress, particularly where the motion is based on the voluntariness of a confession. *Delao v. State*, 235 S.W.3d 235, 238 (Tex. Crim. App. 2007) (quoting *Green v. State*, 934 S.W.2d 92, 98 (Tex. Crim. App. 1996)); *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990); *Bizzarri v. State*, 492 S.W.2d 944, 946 (Tex. Crim. App. 1973). "The determination of whether a statement is voluntary is a mixed question of law and fact, i.e., an application of law to a fact question." *Herring v. State*, 359 S.W.3d 275, 282 (Tex. App.—Texarkana 2012), *aff'd*, 395 S.W.3d 161 (Tex. Crim. App. 2013) (citing TEX. CODE CRIM. PROC. ANN. art. 38.22, § 6 (West 2005); *Garcia v. State*, 15 S.W.3d 533, 535 (Tex. Crim. App. 2000)).

In reviewing the trial court's decision on a motion to suppress evidence, we "[give] almost total deference to a trial court's determination" if the mixed question relies on the credibility of a witness, but apply "a de novo standard . . . [for] mixed questions that do not depend on credibility determinations." *Martinez v. State*, 348 S.W.3d 919, 922–23 (Tex. Crim. App. 2011); *Herrera v. State*, 241 S.W.3d 520, 526–27 (Tex. Crim. App. 2007). A trial court's decision on this matter

10

will only be overturned on appeal where a flagrant abuse of discretion is shown. *Delao*, 235 S.W.3d at 238; *Montanez v. State*, 195 S.W.3d 101, 106 (Tex. Crim. App. 2006); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997); *Alvarado v. State*, 912 S.W.2d 199, 211 (Tex. Crim. App. 1995).

### 2.    Admissibility of Custodial Interrogations

As the Supreme Court of the United States articulated in *Miranda*, "Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney." *Miranda*, 384 U.S. at 444; *see Coffey v. State*, 435 S.W.3d 834, 841 (Tex. App.—Texarkana 2014, pet. ref'd). "'Under both the Federal constitutional standard and the Texas Confession Statute, evidence obtained as a result of a custodial interrogation is inadmissible unless the State proves the officer gave proper warnings and shows an affirmative waiver of rights by the accused.'" *Coffey*, 435 S.W.3d at 841 (quoting *Hutchison v. State*, 424 S.W.3d 164, 175 (Tex. App.—Texarkana 2014, no pet.) (footnotes omitted)); *see Miranda*, 384 U.S. at 444; *Carter v. State*, 309 S.W.3d 31, 35–36 (Tex. Crim. App. 2010) ("Failure to provide the warnings and obtain a waiver prior to custodial questioning generally requires exclusion of statements obtained."); *Ramos v. State*, 245 S.W.3d 410, 418 (Tex. Crim. App. 2008)).

Custodial interrogation refers to "(1) express questioning and (2) 'any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" *Alford v. State*, 358 S.W.3d 647, 653 (Tex. Crim. App. 2012) (quoting *Rhode Island v. Innis*, 446 U.S. 291,

11

301 (1980)). The State concedes that because Lampkin was already under arrest for the stolen truck and was handcuffed by the time Dean arrived, statements made to Dean were the result of custodial interrogation.

Article 38.22, Section 2 of the Texas Code of Criminal Procedure requires an officer to warn a defendant that

> (1)  he has the right to remain silent and not make any statement at all and that any statement he makes may be used against him at his trial;
>
> (2)  any statement he makes may be used as evidence against him in court;
>
> (3)  he has the right to have a lawyer present to advise him prior to and during any questioning;
>
> (4)  if he is unable to employ a lawyer, he has the right to have a lawyer appointed to advise him prior to and during any questioning; and
>
> (5)  he has the right to terminate the interview at any time . . . .

TEX. CODE CRIM. PROC. ANN. art. 38.22, § 2(a) (West Supp. 2014).

Article 38.22, Section 3 of the Texas Code of Criminal Procedure states,

> Sec. 3. (a)  No oral . . . statement of an accused made as a result of custodial interrogation shall be admissible against the accused in a criminal proceeding unless:
>
> (1)  an electronic recording, which may include motion picture, video tape, or other visual recording, is made of the statement;
>
> (2)  prior to the statement but during the recording the accused is given the warning in Subsection (a) of Section 2 above and the accused knowingly, intelligently, and voluntarily waives any rights set out in the warning;
>
> (3)  the recording device was capable of making an accurate recording, the operator was competent, and the recording is accurate and has not been altered;

12

(4)     all voices on the recording are identified; and

(5)     not later than the 20th day before the date of the proceeding, the attorney representing the defendant is provided with a true, complete, and accurate copy of all recordings of the defendant made under this article.

TEX. CODE CRIM. PROC. ANN. art. 38.22, § 3(a) (West Supp. 2014).

### 3.     The Trial Court Did Not Abuse Its Discretion by Overruling Lampkin's Article 38.22 Objection

Cassin testified that upon arresting Lampkin for the stolen truck, he gave Lampkin the statutory warnings. He further testified that Lampkin "shook his head up and down in the affirmative and said yes" when he was asked if he understood his rights. Lampkin does not contend that he did not receive the proper warnings. However, he argues that the statutory requirements of Article 38.22 were not met because the recording does not affirmatively show Lampkin shaking his head up and down in response to Cassin's question of whether he understood his *Miranda* warnings. Thus, Lampkin argues that the recording does not contain a knowing, voluntary, and intelligent waiver.

It is true that neither Lampkin nor Cassin are fully visible on the screen as Cassin is reading the required warnings. However, "a waiver need not assume a particular form and, in some cases, a 'waiver can be clearly inferred from the actions and words of the person interrogated.'" *Joseph v. State*, 309 S.W.3d 20, 24 (Tex. Crim. App. 2010) (quoting *N. Carolina v. Butler*, 441 U.S. 369, 373 (1979)). As a general rule, "'neither a written nor an oral express waiver is required.'" *Id.* at 24 (quoting *Watson v. State*, 762 S.W.2d 591, 601 (Tex. Crim. App. 1988)). "The question is not whether [a defendant] 'explicitly' waived his *Miranda* rights, but whether he did so knowingly, intelligently, and voluntarily." *Id.* at 25. To answer this question,

13

we must determine (1) whether "'the relinquishment of the right . . . was the product of a free and deliberate choice rather than intimidation, coercion, or deception'" and (2) whether the waiver was "'made with full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'" *Id.* (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). "'Only if the "totality of the circumstances surrounding the interrogation" reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.'" *Id.* (quoting *Moran*, 475 U.S. at 421 (quoting *Fare v. Michael C.*, 442 U.S. 707, 725 (1979))).

As to the issue of voluntariness, Lampkin argues on appeal that Cassin could have used coercive measures to secure the waiver of his rights. This argument was not made to the trial court, and no evidence of coercion is shown by the appellate record.[5] As to the issue of an intelligent and knowing waiver, Lampkin contends that he was confused. At the suppression hearing, the trial court resolved this fact question against him.

Lampkin received the proper warnings. On the recording, Lampkin is heard replying with a yes when Cassin asked if he understood the warnings. Although not captured by the recording, according to Cassin, Lampkin "shook his head up and down in the affirmative," indicating that he understood his rights. Further, no evidence suggested that Lampkin did not waive his rights. In light of the two recordings of the arrest and Dean's and Cassin's testimony, we find that the trial court did not abuse its discretion (1) in determining that Lampkin

---

[5]To overturn the trial court's ruling on this argued point would require pure speculation on our part.

voluntarily, intelligently, and knowingly waived his rights and (2) in overruling Lampkin's Article 38.22 objection. Accordingly, we overrule Lampkin's third point of error.

### D. The Trial Court Properly Denied Lampkin's Request to Submit an Article 38.23 Jury Instruction

#### 1. The Objection and Ruling at Trial

At trial, Lampkin requested an instruction to the jury under Article 38.23 of the Texas Code of Criminal Procedure.[6] In overruling his request, the trial court offered the following explanation:

> What the law is and what the evidence shows in this particular case, is that the officer, the Gregg County deputy, read him his statutory warnings under 38.22. It was on video, and it was audio. The voices have been identified. After the officer reads him the warnings, then he asks him if he understands. The defendant affirmatively said yes. On top of that, the officer said he was also shaking and nodding his head yes.

> That officer did not go into any questions, and he is then questioned by the [T]DPS trooper shortly thereafter, all part of the same proceedings and same transactions. And the officer knew that he had been Mirandized.

> Based on that, there has been no evidence to suggest otherwise. No affirmative evidence put on. There is no fact issue for a jury to decide on that. Under these circumstances it is solely a question of law.

Lampkin argues that the trial court erred in refusing to submit an Article 38.23 instruction.

---

[6]Article 38.23 of the Texas Code of Criminal Procedure states,

> (a)    No evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case.
>    In any case where the legal evidence raises an issue hereunder, the jury shall be instructed that if it believes, or has a reasonable doubt, that the evidence was obtained in violation of the provisions of this Article, then and in such event, the jury shall disregard any such evidence so obtained.

TEX. CODE CRIM. PROC. ANN. art. 38.23(a) (West 2005).

15

## 2.    Standard of Review

Our review of alleged jury charge error involves a two-step process.  *Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994); *see Sakil v. State*, 287 S.W.3d 23, 25–26 (Tex. Crim. App. 2009); *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005).  Initially, we determine whether an error occurred and then "determine whether sufficient harm resulted from the error to require reversal."  *Abdnor*, 871 S.W.2d at 731–32; *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g), *reaff'd by Middleton v. State*, 125 S.W.3d 450, 453 (Tex. Crim. App. 2003).

## 3.    Analysis

An Article 38.23 instruction is only required when there is a factual dispute regarding the legality of a search.  *Madden v. State*, 242 S.W.3d 504, 509–10 (Tex. Crim. App. 2007); *Brooks v. State*, 642 S.W.2d 791, 799 (Tex. Crim. App. [Panel Op.] 1982); *Malone v. State*, 163 S.W.3d 785, 802 (Tex. App.—Texarkana 2005, pet. ref'd).  Thus,

> [t]o be entitled to an Article 38.23(a) instruction, . . . the defendant must show that (1) an issue of historical fact was raised in front of the jury; (2) the fact was contested by affirmative evidence at trial; and (3) the fact is material to the constitutional or statutory violation that the defendant has identified as rendering the particular evidence inadmissible.

*Robinson v. State*, 377 S.W.3d 712, 719 (Tex. Crim. App. 2012).

A review of Lampkin's objection at trial demonstrates that he was not arguing about historical facts, i.e., whether a waiver occurred, but instead wanted the jury to determine whether the waiver was knowing, voluntary, and intelligent.  "The first requirement for obtaining a jury instruction under Article 38.23, is that the defendant requests an instruction on a specific historical

16

fact or facts." *Madden*, 242 S.W.3d at 511. Here, the jury heard testimony by Cassin and Dean that Lampkin waived the rights enumerated in Cassin's warning, and Lampkin is heard waving those rights on the recording of the events. As pointed out by the trial court, evidence of Lampkin's waiver was not contested by affirmative evidence at trial. Further, in the absence of supporting evidence, Lampkin's argument that he might have been confused was insufficient to raise a disputed issue of historical fact.[7] When there is no conflict in the evidence that raises a material disputed fact issue, an Article 38.23 jury instruction is not required. *Madden*, 242 S.W.3d at 513; *see Robinson*, 377 S.W.3d at 718–19.

"If there is no disputed factual issue, the legality of the conduct is determined by the trial judge alone, as a question of law." *Madden*, 242 S.W.3d at 510. Accordingly, we conclude that there was no error in the trial court's refusal to instruct the jury under Article 38.23. We overrule Lampkin's fourth point of error.

### E. Lampkin Failed to Preserve Error Regarding Alleged Admission of Extraneous-Offense Evidence

Rule 404(b) of the Texas Rules of Evidence prohibits the introduction of evidence of other crimes to prove the character of a person in order to show action in conformity therewith. TEX. R.

---

[7]As shown in in the following excerpt from the charge conference, Lampkin acknowledged that the evidence before the trial court did not create a disputed fact issue:

> THE COURT: But there is no evidence that he did not -- what evidence is there that he voluntarily -- there's nothing affirmative that has been put on to contest what the officer said.
>
> [BY THE DEFENSE]: Which leads me at the great quandary, the only evidence I could put on would be my client.
>
> THE COURT: And that is a quandary sometimes the defendant find themselves in . . . .

17

EVID. 404(b). In his fifth point of error on appeal, Lampkin argues that the trial court abused its discretion in admitting extraneous-offense evidence in contravention of Rule 404(b).

### 1.     The Objection at Trial

Prior to opening statements, the State agreed not to discuss the theft of the stolen truck in front of the jury, and the trial court granted a motion in limine on that matter. Yet, in an audio/video recording that the State sought to introduce, Cassin asked Lampkin how he started the truck, and Lampkin claimed that his nephew started the truck. Cassin then asked, "You don't think it was strange that the ignition's been punch[ed] out?" Lampkin stated that he had recently acquired the truck. The remainder of his answer was inaudible. Lampkin objected to the State's introduction of this portion of the recording, arguing that the only implication the jury could reach from this testimony was that Lampkin had stolen the truck. The State responded that the evidence was offered to show that Lampkin was so intoxicated he did not notice the ignition had been punched out. The trial court overruled Lampkin's objection.[8]

### 2.     The Argument on Appeal Does Not Comport With the Objection at Trial

On appeal, Lampkin argues that the trial court's ruling was erroneous because it allowed evidence of an extraneous offense in violation of Rule 404(b). We find this issue unpreserved. A "point of error on appeal must comport with the objection made at trial." *Wilson v. State*, 71 S.W.3d 346, 349 (Tex. Crim. App. 2002); *see Swain v. State*, 181 S.W.3d 359, 367 (Tex. Crim. App. 2005). As stated in *Resendez v. State*,

---

[8]The trial court granted Lampkin a running objection to the recording on the ground contained in his trial objection.

18

> Rule 33.1(a) of the Texas Rules of Appellate Procedure provides that a complaint is not preserved for appeal unless it was made to the trial court "by a timely request, objection or motion" that "stated the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context."

*Resendez v. State*, 306 S.W.3d 308, 312 (Tex. Crim. App. 2009) (quoting TEX. R. APP. P. 33.1(a)(1)(A)). "The purpose of requiring a specific objection in the trial court is twofold: (1) to inform the trial judge of the basis of the objection and give him the opportunity to rule on it; [and] (2) to give opposing counsel the opportunity to respond to the complaint." *Id.* "Although there are no technical considerations or forms of words required to preserve an error for appeal, a party must be specific enough so as to 'let the trial judge know what he wants, why he thinks himself entitled to it, and do so clearly enough for the judge to understand him at a time when the trial court is in a proper position to do something about it.'" *Id.* at 312–13 (quoting *Lankston v. State*, 827 S.W.2d 907, 909 (Tex. Crim. App. 1992)).

Our review of the trial transcript leads us to conclude that Lampkin's point of error on appeal does not comport with the objection he made at trial. There is no written motion in the appellate record arguing the grounds for Lampkin's oral motion in limine. The trial court's ruling preliminarily preventing the State from making any reference to the stolen truck was not based on any evidentiary argument, but only on the State's agreement to Lampkin's oral motion. From the objections made at trial and the arguments made in response, it appears that counsel only lodged objections under Rules 401 and 403 of the Texas Rules of Evidence. The trial court's reasoning for overruling Lampkin's motion was also grounded in Rules 401 and 403.

19

Because Lampkin's Rule 404(b) complaint was not asserted below, we find that he has failed to preserve this point of error.[9]

## III. Lampkin's General Ineffective Assistance of Counsel Points of Error

### A. Introduction

As many cases have noted, the right to counsel does not mean the right to errorless counsel. *Robertson v. State*, 187 S.W.3d 475, 483 (Tex. Crim. App. 2006). In order to prevail on a claim of ineffective assistance of counsel, the defendant must satisfy the two-pronged test set forth in *Strickland v. Washington.* 466 U.S. 668, 687–88 (1984); *see also Ex parte Imoudu*, 284 S.W.3d 866, 869 (Tex. Crim. App. 2009). The first prong requires a showing that counsel's performance fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 688. This requirement can be difficult to meet since there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. "This measure of deference, however, must not be watered down into a disguised form of acquiescence." *Profitt v. Waldron*, 831 F.2d 1245, 1248 (5th Cir. 1987) (finding ineffective assistance where counsel failed to request medical records and relied on court-appointed competency examination when he knew client had escaped from mental institution).

---

[9]Moreover, the statement Lampkin wished to exclude was merely that the truck's ignition was punched out. To accept Lampkin's chain of logic that his objection implicated Rule 404(b) notwithstanding his failure to cite that Rule, one would have to accept that the only conclusion the jury could reach from this evidence is that the punched out ignition proved Lampkin stole the vehicle. Yet, this logic fails. The trial court could have determined that this reference was insufficient to suggest that Lampkin committed an offense because (1) there was no mention that Lampkin punched out the truck's ignition and (2) it is equally plausible that the ignition was punched out because (a) someone else tried to steal his truck or (b) Lampkin needed to punch out the ignition to start the truck because he had lost his keys to the vehicle. Accordingly, Lampkin's trial objection failed to implicate Rule 404(b) and is not preserved for appeal.

20

The second *Strickland* prong, sometimes referred to as "the prejudice prong," requires a showing that, but for counsel's unprofessional error, there is a reasonable probability that the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694. "A reasonable probability" is defined as "a probability sufficient to undermine confidence in the outcome." *Id.* Thus, in order to establish prejudice,

> an applicant must show "that counsel's errors were so serious as to deprive defendant of a fair trial, a trial whose result was reliable." [*Strickland*, 466 U.S.] at 687 . . . . It is not sufficient for Applicant to show "that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693 . . . . Rather, [he] must show that "there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695 . . . .
>
> . . . .
>
> The applicant has the burden to prove ineffective assistance of counsel by a preponderance of the evidence. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). Allegations of ineffectiveness must be based on the record, and the presumption of a sound trial strategy cannot be overcome absent evidence in the record of the attorney's reasons for his conduct. *Busby v. State*, 990 S.W.2d 263, 269 (Tex. Crim. App. 1999). The reviewing court must look to the totality of the representation, and its decision must be based on the facts of the particular case, viewed at the time of counsel's conduct so as to eliminate hindsight bias. *Strickland*, 466 U.S. at 690, 104 S.Ct. 2052. In all cases, the "ultimate focus of inquiry must be on the fundamental fairness of the proceeding." *Id.* at 696, 104 S.Ct. 2052.

*Ex parte Martinez*, 330 S.W.3d 891, 901 (Tex. Crim. App. 2011).

A failure to make a showing under either prong defeats a claim for ineffective assistance. *Rylander v. State*, 101 S.W.3d 107, 110–11 (Tex. Crim. App. 2003). Allegations of ineffectiveness "must 'be firmly founded in the record.'" *Bone v. State*, 77 S.W.3d 828, 833 (Tex. Crim. App. 2002) (quoting *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999)). The *Strickland* test "'of necessity requires a case-by-case examination of the evidence.'" *Williams v. Taylor*, 529

21

U.S. 362, 382 (2000) (quoting *Wright v. West*, 505 U.S. 277, 308 (1992) (Kennedy, J., concurring in judgment)).

**B.      Lampkin's General Grounds of Ineffective Assistance First Raised on Appeal**

Lampkin raises four grounds of ineffective assistance of trial counsel that were not addressed in the motion for new trial proceedings.   On appeal, Lampkin argues that his trial counsel's assistance was ineffective because (1) he failed to object to the admission of his BAC test results on the ground that officers used excessive force in obtaining a specimen of his blood, (2) he failed to object to poor quality photographs and the audio/video recording depicting his rant against Dean, (3) he failed to request a mistrial after the State commented on his failure to testify, and (4) he made arguments that were prejudicial to Lampkin.

**1.      Standard of Review Applicable to Ineffective Assistance Claims First Raised on Direct Appeal**

When a claim of ineffective assistance of counsel is raised for the first time on direct appeal, the record "is in almost all cases inadequate to show that counsel's conduct fell below an objectively reasonable standard of performance." *Andrews v. State*, 159 S.W.3d 98, 102 (Tex. Crim. App. 2005).   Nevertheless, "when no reasonable trial strategy could justify the trial counsel's conduct, counsel's performance falls below an objective standard of reasonableness as a matter of law, regardless of whether the record adequately reflects the trial counsel's subjective reasons for acting as she did." *Id*.   Moreover, where the reviewing court "can conceive potential reasonable trial strategies that counsel could have been pursuing," the court "simply cannot conclude that counsel has performed deficiently." *Id*. at 103.   Essentially, when a party raises an ineffective assistance of counsel claim for the first time on direct appeal, the defendant must show that "under

22

prevailing professional norms," *Strickland*, 466 U.S. at 690, no competent attorney would do what trial counsel did or no competent attorney would fail to do what trial counsel failed to do. *Andrews*, 159 S.W.3d at 102.[10]

## C.      Application

### 1.      Sound Strategy Supports Trial Counsel's Decision Not to Object to the Blood Draw on Grounds of Excessive Force

Lampkin argues that counsel rendered ineffective assistance in failing to object to the blood draw on the ground that excessive force was used to obtain the blood sample.[11] "[F]or the general population, the Supreme Court has determined that a blood test is a reasonable means in which to analyze an individual's blood alcohol level." *State v. Johnston*, 336 S.W.3d 649, 659 (Tex. Crim. App. 2011). "'[T]he quantity of blood is minimal, and . . . for most people the procedure involves virtually no risk, trauma, or pain.'" *Id.* (quoting *Schmerber v. California*, 384 U.S. 757, 771 (1966)). Thus, "there is a presumption that venipuncture blood-draw tests are reasonable under the Fourth Amendment." *Id.* However, a blood test must be performed in a reasonable manner in order to survive Fourth Amendment scrutiny. *Id.* at 658 (citing *Schmerber*, 384 U.S. at 768, 771). "Whether a blood draw is conducted pursuant to a warrant or not, the assessment of reasonableness

---

[10]The standard of review is much more deferential to trial counsel's actions when the claim is asserted for the first time on direct appeal because "'[t]he reasonableness of counsel's choices often involves facts that do not appear in the appellate record[,]'" *Rylander*, 101 S.W.3d at 110 (quoting *Mitchell v. State*, 68 S.W.3d 640, 642 (Tex. Crim. App. 2002)), and because "trial counsel should ordinarily be afforded an opportunity to explain his actions before being denounced as ineffective." *Id.* at 111 (quoting *Bone*, 77 S.W.3d at 836). Here, Lampkin has raised two categories of ineffective assistance claims: (1) those which were alleged in his motion for new trial and litigated at the hearing, and (2) those which were raised here for the first time and which were not litigated at the hearing. The first category will be addressed under the general *Strickland* standard of review for ineffective assistance claims. The second category will be assessed according to the standard applicable to ineffective assistance claims raised for the first time on appeal.

[11]Counsel filed a motion to suppress the blood draw, and the trial court held a hearing on the matter during which it was established that the blood draw was authorized by a valid warrant.

23

is purely a matter of Fourth Amendment law." *Id.* at 661. The inquiry is made on a "case-by-case basis in light of the totality of the circumstances surrounding the draw." *Id.*

As Lampkin was being transported to the hospital, he threatened to file a complaint against Dean for racial profiling and, after several minutes of ranting, claimed that he needed to see a doctor because he was experiencing pain in his wrists. Dean testified that he showed Lampkin the warrant but that Lampkin still refused to submit to the blood draw and began "yelling and cussing." According to Lampkin, his refusal caused Dean to "grab him and push him face down on the hospital bed" so that the nurse, Don Leach, could complete the extraction. Both Leach and Dean testified that Lampkin was complaining of left wrist pain after the blood draw. However, Dean said that Lampkin was examined by a doctor and received a medical clearance to be admitted to jail.

The use of physical force and restraint to obtain a blood sample does not render a blood draw unconstitutional unless the force is excessive. *Id.* at 663–64 (finding reasonable acts of "strapping [the defendant's] legs and left arm to the phlebotomy chair with gauze and then holding [the defendant's] right arm down to obtain a sample"). The record does not contain counsel's reasons for failing to object to the blood draw on the ground that the amount of force used to obtain the sample was unreasonably excessive. Counsel could have decided not to object because (1) Lampkin requested to see a doctor for wrist pain before he even arrived at the hospital and therefore he could not establish that Dean's actions caused Lampkin's pain or (2) he believed that Lampkin's claim of excessive force could not be established and accusing an officer of excessive force without being able to prove it risked alienating jurors. Further, there was no evidence that

24

Lampkin was actually injured and no description of whether Lampkin even classified his wrist pain as anything more than minor pain associated with a reasonable amount of restraint necessary under the circumstances. Thus, it is possible that counsel decided not to object because he did not consider any use of force by Dean to be unreasonable. Accordingly, we find that Lampkin has failed to meet the first *Strickland* prong with respect to this complaint.

### a. Trial Counsel's Failure to Object to Photographs Was Correct

Lampkin argues that counsel rendered ineffective assistance when he failed to object to photographs of Lampkin's face taken on the day of his arrest on the ground that no predicate was laid to establish their admissibility. "There is a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance and that the challenged action could be considered sound trial strategy." *Lemmons v. State*, 426 S.W.3d 267, 271 (Tex. App.— Texarkana 2013, pet. ref'd). The record does not contain counsel's reasoning for failing to object to the photographs. Yet, at trial, Cassin testified that the photographs were a fair and accurate depiction of Lampkin on the night of his arrest.[12] This is sufficient testimony to authenticate a photograph. *See Huffman v. State*, 746 S.W.2d 212, 222 (Tex. Crim. App. 1988) ("'[T]the only identification or authentication required [to admit a photograph] is that the offered evidence properly represent the person, object or scene in question. This may be testified to not only by the photographer or a person photographed, but by any other witness who knows the facts, even though the witness did not take the photograph himself or see it taken.'") (quoting 36 TEX. JUR.3D

---

[12]Lampkin attempts to argue that he was harmed by the admission of the photographs because they were blurry, and thus, were not fair and accurate.

EVIDENCE, § 463, pp. 343–45). We find that it is entirely possible that trial counsel did not object to the photographs on predicate grounds because he knew that the predicate was established by Cassin. *See In re A.W.T.*, 61 S.W.3d 87, 89–90 (Tex. App.—Amarillo 2001, no pet.) (per curiam) ("[T]he evidence regarding appellant's recent history of criminal behavior . . . was admissible, and, it being admissible, counsel was not obligated to object to it to avoid claims of ineffective assistance.").

### b. Trial Counsel's Failure to Object to the Dash Cam Recording Could Have Been a Strategic Decision

Lampkin also argues that counsel rendered ineffective assistance in failing to object under Rule 403 of the Texas Rules of Evidence to the dash cam recording demonstrating that Lampkin became belligerent after his arrest, threatened to make a formal complaint against Dean for racial profiling, and told Dean he would "have [his] badge." Under Rule 403, relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." TEX. R. EVID. 403.

Again, we do not have counsel's reasons for failing to object to this evidence. This recording provided a close-up view of Lampkin's face on the day of his arrest. Lampkin's rant, including his threats against the arresting officer, demonstrated Lampkin's level of intoxication and his slurred speech. It is conceivable that counsel believed that (1) while the recording was prejudicial, its probative value was not substantially outweighed by the danger of unfair prejudice, (2) the recording would not confuse or mislead the jury, (3) the recording was not cumulative of any other evidence because it provided the only close-up of Lampkin's face, and (4) there were no

26

considerations of undue delay because the recording was relatively short. In view of these potential strategic considerations, we cannot say that counsel's failure to object to the dash cam recording was unreasonable.[13]

Thus, we conclude that Lampkin has failed to show that counsel's decisions to refrain from objecting to the photographs and recording fell below an objective standard of reasonableness.

### c. Sound Trial Strategy Supports Counsel's Decisions to Not Object During the State's Closing Argument and to Not Move for a Mistrial

Lampkin next argues that trial counsel rendered ineffective assistance because he failed to object to the State's comment on Lampkin's failure to testify and failed to move for a mistrial based on the State's comment.

The record demonstrates that trial counsel objected when the State first argued that Lampkin had "no excuse" for his actions, as demonstrated by this portion of the transcript:

> [BY THE STATE]: We talked about having no excuse, right? We also talked about --
>
> [BY THE DEFENSE]: Judge, Defense has no burden. I don't appreciate the State implying that we need to come up with an excuse.
>
> THE COURT: I'm going to overrule that objection. The burden is on the State, but I'm going to overrule that objection.

Soon thereafter, the State made the following argument, without objection: "And you get on the roads with members of this community, and you're going to put all of those people in danger. For

---

[13]Further, "[t]o show ineffective assistance of counsel for the failure to object during trial, the applicant must show that the trial judge would have committed error in overruling the objection." *Ex parte White*, 160 S.W.3d 46, 53 (Tex. Crim. App. 2004). In his briefing, Lampkin fails to argue that the trial court would have erred in overruling a Rule 403 objection to the dash cam recording.

27

what reason? You have no excuse for being this selfish. You have no excuse for doing what you did that night." Lampkin argues that counsel should have re-urged his objection.

The record is silent as to trial counsel's reasoning for failing to object to the State's second argument that Lampkin had "no excuse." However, "Texas courts have held that in some circumstances, a defendant is not required to constantly repeat an objection." *Cardenas v. State*, 787 S.W.2d 160, 162 (Tex. App.—Houston [1st Dist.] 1990, pet. ref'd). "One such circumstance is when the objection would be futile because the court has just overruled a valid objection . . . ." *Id.* (citing *Graham v. State*, 710 S.W.2d 588, 591 (Tex. Crim. App. 1986)). Moreover, even if the trial court erred in overruling the first objection, it instructed the jury that the State had the burden of proof, which cured the error. *See Orellana v. State*, 381 S.W.3d 645, 652 (Tex. App.—San Antonio 2012, pet. ref'd) (holding that trial court's sua sponte instruction to jury that "it was the State that bore the burden of proof, the defense was not required to prove anything" cured any error caused by trial court's overruling of objection to State's question establishing that defense can request blood testing.).

Here, we find that counsel may have reasonably believed that any further objection would have been futile given that his initial objection was recently overruled. He may also have concluded that by continuing to object, he would be emphasizing a point that he did not want the jury to consider in the first place. Further, because the trial court overruled his initial objection, trial counsel was not required to move for a mistrial in order to preserve error. *Cardenas*, 787 S.W.2d at 162. Thus, we find that Lampkin has not met the first *Strickland* prong with respect to these alleged acts of ineffective assistance.

28

#### d. Sound Trial Strategy Exists for Counsel's Closing Arguments

Referring to the dash cam recording of the stop and photographs of Lampkin's face taken during his arrest, Lampkin's counsel made the following statements during closing argument:

> [The photographs introduced as] State's [Exhibits] 6 and 7 are incredibly grainy, incredibly black and white. This looks like the video footage they show on those ghost hunter television shows saying, "Oh, look there's something that goes bump in the night." Matter of fact, I think one of these, I'm going to put on my front door for Halloween next year to scare the trick-or-treaters because it looks like a zombie picture. I don't think this is indicative of what a glassy eye would look like. I would prefer it to be in color and being a higher quality photograph.

Lampkin argues that counsel rendered ineffective assistance in making this argument because it cast Lampkin in a bad light.

The record is devoid of counsel's reasoning for making the argument. However, it appears that counsel was arguing that by introducing poor quality photographs with lighting that made Lampkin look like a "zombie," the State was attempting to mislead the jury by casting Lampkin in a bad light. Further, he appears to be arguing that the poor quality of the photographs rendered them useless as evidence. Accordingly, we can conceive of a sound trial strategy behind counsel's argument.

In sum, "we can conceive potential reasonable trial strategies that counsel could have been pursuing" in each of these areas. *Andrews*, 159 S.W.3d at 103. Accordingly, Lampkin cannot meet the first *Strickland* prong with respect to any of his claims of ineffective assistance of counsel raised for the first time on appeal. Thus, we overrule his points of error relating to these new grounds.

29

**IV.    Lampkin's Ineffective Assistance Claims Based on Counsel's Failure to Investigate and Litigate Lampkin's Mental Health Status**

**A.    Lampkin's General Ineffective Assistance Grounds Raised by Motion for a New Trial**

By motion for a new trial, Lampkin argued that trial counsel rendered ineffective assistance in (1) failing to request a competency examination and hearing, (2) failing to investigate Lampkin's mental health status, (3) failing to present mitigating evidence of his mental health status during punishment, (4) failing to properly advise Lampkin that he would be subjected to cross-examination by the State if he testified during punishment, and (5) requiring Lampkin to testify during punishment.  After a full evidentiary hearing, the trial court denied Lampkin's motion for a new trial.  Lampkin argues that the trial court's decision to overrule the motion for a new trial was erroneous.

**1.    Standard of Review Applicable to Ineffective Assistance of Counsel Claims First Raised in a Motion for a New Trial**

With respect to Lampkin's ineffective assistance of counsel claims that were presented during the motion for new trial proceedings, we employ the following standard of review as set forth in *Riley v. State*:

> An appellate court reviews a trial court's denial of a motion for new trial for an abuse of discretion, reversing only if the trial judge's opinion was clearly erroneous and arbitrary. A trial court abuses its discretion if no reasonable view of the record could support the trial court's ruling. This deferential review requires the appellate court to view the evidence in the light most favorable to the trial court's ruling. The appellate court must not substitute its own judgment for that of the trial court and must uphold the trial court's ruling if it is within the zone of reasonable disagreement. "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."

30

*Riley v. State*, 378 S.W.3d 453, 457 (Tex. Crim. App. 2012) (citations omitted) (quoting *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 574 (1985)).  When the trial court denies a motion for a new trial alleging ineffective assistance of counsel, "we view the relevant legal standards through the prism of abuse of discretion." *Ramirez v. State*, 301 S.W.3d 410, 415 (Tex. App.—Austin 2009, no pet.).  Thus, we decide whether the trial court erred in determining that Lampkin failed to meet the two-prong *Strickland* test.  Because Lampkin's first three issues involve evidence of his mental health history, it is necessary to discuss that history in more detail.[14]

### 2.    Factual Background

#### a.    References Prior to and During Trial Relating to Lampkin's Mental Health

Prior to and during trial, Counsel had concerns about Lampkin's mental health.  In a September 17, 2013, letter, trial counsel wrote,

> I would like to address your mental competency.  I am deeply concerned about your mental stability.  Have you ever had any mental issues?  Have you ever been on any medication for a mental disorder?  You have repeatedly asked me to do the same thing after I have explained to you why it cannot be done.

> Some of your actions are not the actions of a normal person.

On September 26, 2013, trial counsel wrote,

> I did not question your mental stability because you requested that I file timely Motions.  I question your stability because you did so three times in one day, and purported by your own writings in excess of seven times in the past two months.  You have mailed me 36 pages of correspondence in the past two months; much of it is very repetitious.  I am glad to see that you actually responded to the contents

---

[14]Because we have a record of trial counsel's strategy with respect to the alleged acts of ineffective assistance litigated in the hearing on Lampkin's motion for new trial, we do not apply the more differential standard of review applicable to ineffective assistance of counsel claims first raised on direct appeal.  *See supra* note 10.

31

of one of my letters, I was becoming deeply concerned that you were not even reading my correspondence.

During opening statement, trial counsel told the jury, "I think [Lampkin] just has problems grasping certain concepts and didn't understand the questions that [were] being proposed to him [during the traffic stop]." Also, when objecting to the introduction of statements made by Lampkin during the stop, counsel argued,

> [T]his Court has admonished my client on at least two separate occasions that I am the lawyer, he is not, he's not to address the Bench, yet he continues to do so. I think he's confused -- I think he's competent to stand trial, but I think he was confused on those previous days. I think he was confused earlier when he addressed the Court. I think he was confused earlier when he was given his *Miranda* warnings.

Lampkin testified during the punishment phase of his trial and informed the jury that he had complied with treatment plans formulated by the Center of Excellence Program offered through a Mental Health Mental Retardation (MHMR) facility in Dallas.

### b.     Lampkin's Mental Health Records

The record from Lampkin's trial led appellate counsel to investigate Lampkin's mental health history. He discovered records relevant to the issue and filed a motion for a new trial on the basis of this new information, arguing that Lampkin's trial counsel was ineffective in failing to investigate Lampkin's mental health background and in failing to introduce that evidence to the jury. Included in the newly discovered information were documents that were created after April 12, 2006, when Lampkin was sentenced to nine months' confinement in a state jail facility for possession of cocaine. According to a Correctional Managed Care Mentally Retarded Offender Program (MROP) note, after his release from prison, Lampkin became homeless, had no income,

32

could not find a job, could not pay for food, had problems sleeping due to dreams about his past drug use, and was depressed. Lampkin was assisted by Metrocare Services, the organization that Lampkin referred to as a MHMR facility in Dallas.

During the hearing on Lampkin's motion for a new trial, appellate counsel introduced numerous records created after Lampkin's first documented encounter with Metrocare on May 30, 2007. These records contained evidence that Lampkin had a low IQ, was referred to as mentally retarded, and began experiencing mental health issues as a result of long term drug use. The records note that he was paranoid and hearing voices and that he was taking medicine for paranoia. They also indicate that he was diagnosed with a major depressive disorder with psychotic features.

The records also contained some evidence that was unfavorable to Lampkin. For example, they state that at one point, he was exaggerating his symptoms of joint pain to obtain a top bunk assignment. Also, they indicate that when he applied for Social Security Disability, the administrative judge presiding over his case thought he was faking his symptoms and ordered additional testing before completing the hearing. A timeline of excerpts from those records is included as an appendix to this opinion.

### c. Testimony at the Motion for a New Trial Hhearing

During the hearing on the motion for a new trial, appellate counsel called trial counsel as a witness. Trial counsel admitted that the question of Lampkin's competency weighed on his mind. Trial counsel further testified that he thought about moving for a competency examination based on Lampkin's "obsessive compulsive behavior." However, trial counsel explained that his concerns were mooted because Lampkin "wrote [him] copious things to help in his defense."

33

The record supports trial counsel's assertion that Lampkin actively corresponded with trial counsel about his case. The September 17, 2013, letter included trial counsel's response to several letters sent by Lampkin in which Lampkin raised various legal issues. Counsel's letter (1) acknowledged receipt of several letters by Lampkin requesting that counsel timely file pretrial motions, (2) explained that no statute of limitations barred the use of prior DWI convictions in an indictment for DWI, third or more, (3) addressed Lampkin's argument that Dean and Cassin did not have probable cause to draw his blood, (4) addressed Lampkin's complaints about the enhancement paragraphs being read in court, and (5) responded to Lampkin's double jeopardy concerns. In addressing Lampkin's apprehension about the use of his prior convictions, trial counsel responded, "You further request again that I do something magical to make your criminal history disappear." While counsel acknowledged that his letter stated that he was concerned about Lampkin's mental health and his competence to stand trial, counsel later characterized these remarks as expressions of annoyance.

Counsel testified, "Part of what I did was to get [Lampkin] to quit writing me the same damn letter repeatedly, over and over. I meant it as an insult to say, 'I got your first letter. I answered your first letter. You don't need to ask me again.'"[15] "And after he received this letter, [Lampkin] told me he was competent. He took it as an insult." According to counsel, Lampkin said, "I'm trying to protect my rights and you want to . . . question my competency?" Counsel admitted that the question of competency weighed on his mind, but testified,

---

[15]Counsel also said, "I was becoming concerned that he was writing me multi -- multiple letters a day, multiple letters a week. I was responding to them, and it was like he wasn't reading my letters. And I wanted to see if he was indeed reading the material I was sending him."

34

> I quit questioning his competency when I questioned it in the letter and instead of him saying, . . . 'you know, I have been on a lot of medication; . . . I did spend a lot of time in some facility,' he didn't offer that. Instead he said, "I'm very competent, I know what I'm doing, I want to defend my rights."

When asked whether it would have been prudent to request his records after raising a question about his mental stability, trial counsel merely replied, "I didn't know those records existed."

According to trial counsel, Lampkin understood the charges against him, the nature of the proceeding, the potential consequences of the proceeding, the role of judge and jury, and the range of punishment he faced. Counsel testified that Lampkin "knew who the State was, . . . knew who the Judge was, . . . wanted an examining trial, [and] . . . wanted [counsel] to change venue." He added (1) that Lampkin engaged in reasoned choices regarding legal strategy, (2) that Lampkin's first letter to him was a request for an evidentiary hearing, (3) that he filed a motion for bond reduction and made other objections at Lampkin's request,[16] and (4) that Lampkin helped make peremptory strikes during voir dire. Counsel testified that Lampkin could exhibit appropriate courtroom behavior and decided wisely not to testify during the guilt/innocence phase of the trial. Based on Lampkin's behavior, counsel concluded that Lampkin "just seemed to be intelligent but also obsessive compulsive." Counsel told the trial court, "I think Mr. Lampkin knew what he was doing."

---

[16]During a pretrial hearing, Lampkin attempted to make several legal arguments, including the one below:

> Your Honor, sir, may I have a chance to say, please, sir. What -- my complaint was that when the prosecutor came to me with 45-year TDCJ offer, he violated my double jeopardy clause because he's using enhancements against me that -- that's not pertaining to my -- my case here. I can get a 45-year sentence in jail, and then for the times I requested for a bond hearing in the 188th District Court and I was trying to get that bond hearing and they went up on my bond because I requested for a bond hearing. My bonds were $15,000, Your Honor, and they increased it to a $55,000 bond where I can't -- where I can't get out, where I can't post bond. And, to me, you know, letting me have a fair chance, you know, to a fair trial, getting my bond reduced down.

35

Yet, counsel admitted that had he known Lampkin had a mental health history, he would have been able to locate the mental health records that appellate counsel introduced during the motion for a new trial hearing. Referring to these records, trial counsel testified (1) that he would have argued that Lampkin was not a reckless individual but only that he was mildly mentally retarded, (2) that he "might have" offered the mental health records as mitigating evidence during punishment, and (3) that Lampkin might have gotten some sympathy from the jury had he employed these strategies.

The State's prosecuting attorney, Christopher Botto, also testified that he had no reason to question Lampkin's competence. Botto explained, "When [Lampkin] would speak to me, he was always very polite and kind and meek. . . . [I]t was as if he knew I was the one making the offers and he understood what my role was. And he -- it seemed like he was trying to play on my sympathy." Botto said, "[Lampkin] always referred to me as Mr. Botto. He would ask me questions. He would ask me questions about the offer such as, 'Come on, Mr. Botto, can't you do better than that,' as if he's been in that position before, as if he knew exactly what was going on." Lampkin asked Botto if he could plead guilty to stealing the car in exchange for a dismissal of the DWI charge. Botto informed the trial court that he discussed with Lampkin the false concern that his double jeopardy rights were being violated due to the State's use of his prior DWI convictions to increase the level of offense. Botto also testified that the motion to suppress was filed "at the behest of Mr. Lampkin" even though there were "no issues for a suppression hearing." Botto opined that his interaction with Lampkin established that Lampkin had an IQ of over 70.

36

William H. McCoy, an attorney who aided Lampkin's trial counsel during voir dire, testified that Lampkin assisted in his defense and helped counsel in making peremptory strikes. McCoy's first observation of Lampkin yielded a conclusion that Lampkin was "slow" and "[n]ot the sharpest knife in the drawer." However, McCoy also testified that Lampkin appeared to comprehend his conversations with counsel. McCoy said he had no "concern about [Lampkin's] competency or [his] understanding [of] what was happening to him that day." McCoy added, "I run across individuals like Mr. Lampkin. And God help them, they can't help themselves for getting in trouble, for whatever reason."

Lampkin also filed an affidavit in support of his motion for a new trial swearing that he had mental health issues and learning disabilities and that he did not understand "some of [the] things that were going on in [his] defense." After the evidentiary hearing, the trial court determined that Lampkin was competent to stand trial and that he was not prejudiced by trial counsel's failure to investigate and introduce evidence of his mental health history during the punishment phase of trial. Accordingly, the trial court overruled Lampkin's motion for a new trial.

## B. The Trial Court Did Not Err in Finding that Counsel's Decision to Forego a Competency Examination and Hearing Was Reasonable

It is a fundamental principle of this nation's system of criminal justice "that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial." *Drope v. Missouri*, 420 U.S. 162, 171 (1975). Due process prohibits convictions of mentally incompetent persons. *Turner v. State*, 422 S.W.3d 676, 688–89 (Tex. Crim. App. 2013); *Corley v. State*, 582 S.W.2d 815, 818 (Tex. Crim. App. 1979) (citing *Bishop v.*

37

*United States*, 350 U.S. 961 (1956)). "'This constitutional right cannot be waived by the incompetent—by guilty plea or otherwise.'" *Bouchillon v. Collins*, 907 F.2d 589, 592 (5th Cir. 1990) (quoting *Carroll v. Beto*, 421 F.2d 1065, 1067 (5th Cir. 1970)).

A competency hearing is a separate and independent hearing from the trial. TEX. CODE CRIM. PROC. ANN. art. 46B.005 (West 2006). "'The purpose of a separate hearing is to allow a determination uncluttered by evidence of the offense itself,'" since guilt is not an issue. *Lasiter v. State*, 283 S.W.3d 909, 915 (Tex. App.—Beaumont 2009, pet. ref'd) (quoting *Basham v. State*, 608 S.W.2d 677, 679 (Tex. Crim. App. 1980)). The requirements are simple: "(b) Except as provided by subsection (c), the court shall hold a trial under Subchapter C before determining whether the defendant is incompetent to stand trial on the merits." TEX. CODE CRIM. PROC. ANN. art. 46B.005(b). Under subsection (c), a competency trial is required if requested by counsel. TEX. CODE CRIM. PROC. ANN. art. 46B.005(c).

"A defendant is presumed competent to stand trial and shall be found competent to stand trial unless proved incompetent by a preponderance of the evidence." TEX. CODE CRIM. PROC. ANN. art. 46B.003(b) (West 2006). However, where there is evidence suggesting a defendant would be entitled to a competency hearing, the conviction may be reversed for a due process violation even if a hearing was not requested at trial. *Corley*, 582 S.W.2d at 818 (citing *Drope*, 420 U.S. 162); *Pate v. Robinson*, 383 U.S. 375, 376, 378 (1966). "A person is incompetent to stand trial if the person does not have: (1) sufficient present ability to consult with the person's lawyer with a reasonable degree of rational understanding; or (2) a rational as well as factual

38

understanding of the proceedings against the person." TEX. CODE CRIM. PROC. ANN. art. 46B.003(a) (West 2006).

Any suggestion of incompetence to stand trial calls for an informal inquiry. TEX. CODE CRIM. PROC. ANN. art. 46B.004 (West Supp. 2014). Evidence suggesting the need for an informal inquiry may be based on observations related to the defendant's capacity to:

> (A)    rationally understand the charges against [him] and the potential consequences of the pending criminal proceedings;
> (B)    disclose to counsel pertinent facts, events, and states of mind;
> (C)    engage in a reasoned choice of legal strategies and options;
> (D)    understand the adversarial nature of criminal proceedings;
> (E)    exhibit appropriate courtroom behavior; and
> (F)    testify[,]

or "on any other indication that the defendant is incompetent to stand trial within the meaning of Article 46B.003." TEX. CODE CRIM. PROC. ANN. arts. 46B.004, 46B.024(1) (West Supp. 2014). Additional considerations include the defendant's current indications of mental illness, his personal history of mental illness, whether the condition has lasted or is expected to last continuously for at least one year, the degree of impairment resulting from the mental illness, the specific impact of any impairment on the defendant's capacity to rationally engage with counsel, whether the defendant takes psychoactive or other medications, the effect, if any, such medication may have on the defendant's appearance, demeanor and ability to participate in the proceedings. TEX. CODE CRIM. PROC. ANN. art. 46B.024(2)–(5) (West Supp. 2014).

On the other hand, "the fact that a defendant is mentally ill does not by itself mean he is incompetent." *Turner*, 422 S.W.3d at 691; *see McDaniel v. State*, 98 S.W.3d 704, 711 (Tex. Crim. App. 2003). "It is not enough . . . to allege unspecified difficulties in communicat[ion] . . . ."

*Moore v. State*, 999 S.W.2d 385, 394 (Tex. Crim. App. 1999). Rather, there must be "specific and illustrative [evidence] of a present inability to communicate with the defendant." *Id.* Further, "[e]vidence of mental impairment alone does not require that a special jury be empaneled where no evidence indicates that a defendant is incapable of consulting with counsel or understanding the proceedings against him." *Id.* at 395; *see Turner*, 422 S.W.3d at 690–91 ("[The] legislative criteria for competency contemplate a defendant who is at least minimally able to interact with his trial counsel in a 'reasonable and rational' way (even if they do not necessarily agree) in formulating decisions how most effectively to pursue his defense.").

Lampkin's mental health records suggested that Lampkin had borderline intellectual functioning and experienced other mental health issues until 2010. In his affidavit, Lampkin stated that he was unable to understand "some" of the trial court proceedings. In denying Lampkin's claim of ineffective assistance of counsel based on the failure to request a competency examination and hearing, the trial court ruled,

> Yes, there [are] some references in Defendant's Motion for New Trial [Exhibits] . . . about the defendant's IQ tests and where he stands. As to the references of mild retardation, . . . the mild retardation was only an initial diagnosis, but once they got further into it, most of the records, especially in 2009, reflect that he -- the diagnosis or the Axis II diagnosis under the Diagnostic and Statistical Manual is borderline intellectual functioning; that is above mild retardation.
>
> That is a -- shows more intelligence. It is higher -- results from a higher IQ. That in and of itself does not make somebody incompetent to stand trial. . . .
>
> This defendant wrote this Court numerous letters showing his -- a rational as well as factual understanding of the proceedings against him. . . . [A]fter the Motion to Suppress and the Motion to Quash was denied, this defendant filed a

40

motion . . . wanting his attorney to appeal, and then stating grounds on why he thought that I erred in making the -- in overruling his motions.[17]

> This defendant was able to definitely assist in his trial. He showed a clear rational as well as factual understanding of the proceedings against him. This Court had no question as to his mental competency during any court proceedings. . . . [A]lso, the Court did notice when it read the Affidavit that the defendant is definitely competent, at least in his current attorney's view, to file an affidavit. . . .

The trial court did not err in making this ruling. Here, the evidence before the trial court established that during a mental retardation evaluation, Lampkin "exaggerate[ed] symptoms of mental retardation," but "when confronted[,] beg[an] displaying an adequate amount of effort to answer questions truthfully." Subsequently, the mental health records indicate that an administrative judge presiding over a hearing to determine Lampkin's disability status for purposes of Social Security benefits found that Lampkin was "faking his disability." Because no medical or mental health records were provided to the trial court clarifying Lampkin's mental health after 2010, the trial court had no evidence that Lampkin's current mental status impacted his competency to stand trial. Lampkin's trial counsel, Assistant District Attorney Botto, and McCoy all testified that their conversations with Lampkin led them to conclude that Lampkin was competent. The trial court, which was in the best position to observe Lampkin, found that Lampkin demonstrated his competency to stand trial through legal arguments he made during hearings and in pro se motions and correspondence filed with the trial court.

---

[17]Lampkin filed an intelligible pro se motion for a new trial.

The record from Lampkin's trial further supports the trial court's decision to reject this ground of ineffective assistance of counsel. At punishment, Lampkin made the following statement and plea for mercy:

> Ladies and gentlemen of the jury, how are you today? I just want you to know that I accept responsibility for what I have done. I thought that I was not intoxicated. I respect the jury's verdict. I would request an opportunity to change.
>
> I paid my debt to society, and I am ready to move on with my life. And the reason why I'm saying that I had paid my debt to society, and I'm ready to move on with my life is that when I first came here it took me two, about two-and-a-half months, two months to get down on my knees and ask God to forgive me for what I had done. . . .
>
> And when you see the pictures pertaining to me and my wife, at that time I was well equipped in recovery, you know, treatment, you know. I was maintaining my sobriety. I was attending my AA meetings and classes, and it was very helpful for me.
>
> . . . .
>
> But as far as me just being a person that had a bad habit, just violently aggressive, I'm not. You know, I work. You know, I have compassion for people, you know. And it's just -- you know, we get weak, we get weak and make bad choices sometimes.
>
> . . . .
>
> And I regret that today, every day I try to get on my knees and ask to forgive myself for what I've done because I know what I've done was improper. And if there's any chance that I could be given the chance to change, given the chance to be that person that I once was, that I thought that I could be, that intelligent human being that respects humanity, that I have love for God's creation, you know, not only just person, but the animals, the bees and the birds.
>
> . . . .
>
> It was not my intent to do what I did intentionally. And I'm asking for mercy -- for the Court to have mercy and be lenient on me to where I can get back into that program, if it has to be here or wherever it had to be. But I accept my

42

> responsibility, and I just want to say to the Court and to the honorable jurors that I'm -- please forgive me if I done -- caused any problems or disruptive. I'm just asking for lenient.

Lampkin's pleas to the jury demonstrated his awareness of the nature and the consequences of the proceeding. *See Magic v. State*, 217 S.W.3d 66, 74 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (refusing to find ineffective assistance for failure to request competency hearing where defendant, although suffering from bi-polar disorder, demonstrated competence in dealings with court and through pro se motions he filed).

In light of the statutory presumption of competence to stand trial, the appellate record, and the lack of evidence that Lampkin's mental condition "operate[d] in such a way as to prevent him from rationally understanding the proceedings against him or engaging rationally with counsel in the pursuit of his own best interests," we conclude that the trial court did not err in finding that counsel's decision to forego a request for a competency examination and hearing was reasonable. *Turner*, 422 S.W.3d at 691. Further, from our review of Lampkin's medical records, we conclude that Lampkin cannot demonstrate "a reasonable probability that he would have been found incompetent to stand trial if the issue of competency had been raised and fully considered." *Ex parte LaHood*, 401 S.W.3d 45, 54 (Tex. Crim. App. 2013). Because Lampkin did not meet the *Strickland* standard, the trial court properly denied his motion for a new trial on this ground of ineffective assistance of counsel. Accordingly, we overrule this point of error.

### C.   Counsel's Failure to Investigate Lampkin's Mental Health Status for Use as Potential Evidence of Mitigation at the Punishment Phase of Trial Constituted Deficient Performance

#### 1.   The Standard of Review Under *Wiggins v. Smith*, 539 U.S. 510 (2003)

Yet, counsel's determination that Lampkin was competent and his decision to forego a competency evaluation did not render Lampkin's mental status irrelevant, because the same facts that caused counsel to question Lampkin's competence, if investigated, would have led to the discovery of a substantial mental health history which could have been evaluated for use as mitigating evidence at trial. A criminal defense lawyer must have a firm command of the facts of the case as well as governing law before he can render reasonably effective assistance to his client—in or out of the courtroom. *Ex parte Ybarra*, 629 S.W.2d 943, 946 (Tex. Crim. App. 1982). Thus, "counsel has a duty to make *reasonable* investigations." *Strickland*, 466 U.S. at 691 (emphasis added). "'Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.'" *Wiggins v. Smith*, 539 U.S. 510, 521–22 (2003) (quoting *Strickland*, 466 U.S. at 690). However,

> "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."

*Id.* (quoting *Strickland*, 466 U.S. at 691); *see Ybarra*, 629 S.W.2d at 946.

Accordingly, in any criminal case, counsel must first evaluate what "conceivable line[s] of mitigating evidence" exist and then decide whether following any of those lines would likely lead

to evidence that "would . . . assist the defendant at sentencing." *Wiggins*, 539 U.S. at 533. In determining what the conceivable leads are, counsel must first evaluate the information available to him at that time. The reviewing court must decide whether the attorney's decision either to forego investigation, or to stop investigating at some later point, was reasonable "'under prevailing professional norms.'" *Id.* at 522–23 (quoting *Strickland*, 466 U.S. at 688). In evaluating whether counsel's decisions were reasonable under the norms of the profession, the reviewing court must defer to trial counsel's decisions required by *Strickland*, taking into consideration "not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Id.* at 527. Counsel's performance must be viewed objectively and "'from counsel's perspective at the time.'" *Id.* at 533 (quoting *Strickland*, 466 U.S. at 689). Stated simply, the court must decide whether a reasonable attorney would consider the information available to defense counsel worthy of further investigation, and if so, how much additional investigation a reasonable attorney would perform.

But a decision to investigate or not to investigate a potential lead must be made; a failure to investigate is not deemed reasonable simply because counsel did not consider it. On the other hand, it is possible that the existence of some mitigating evidence might be so unlikely that no attorney would conceive of its existence; it is also possible that a defendant might not want his counsel to know of the information and might not assist his attorney in finding it. Nevertheless, an attorney cannot remain indifferent to the existence of mitigating evidence. Therefore, we must decide, under the prevailing norms of our profession, whether counsel could have reasonably failed

45

to investigate Lampkin's mental health history given the information available to him in this case. *See Strickland*, 466 U.S. at 690.

### 2.  Application

The first step in this analysis is to identify the information available to trial counsel that would trigger a duty to investigate further.  Second, we must determine whether, viewed objectively and "'from counsel's perspective at the time,'" *Wiggins*, 539 U.S. at 533 (quoting *Strickland*, 466 U.S. at 689), "the known evidence would lead a reasonable attorney to investigate further," *Id*. at 527.

### a.  Information Available to Trial Counsel and His Response to that Information

With respect to the first issue, trial counsel admitted he had concerns about Lampkin's mental status as it related to Lampkin's competency.  Counsel's letters to Lampkin document these concerns, and he even asked Lampkin if he had mental issues or was taking medication for a medical disorder.  Trial counsel admitted that a fair conclusion to draw from those letters is that he had concerns about Lampkin's mental stability and competence.  He also admitted that Lampkin persisted over several months in the behaviors which caused him to send the letters to Lampkin in the first place.  Moreover, attorney McCoy testified that he had concerns about Lampkin's competence to stand trial when he first met him, though he quickly resolved those concerns after visiting with him.  Trial counsel further testified that he sent letters to Lampkin asking him to identify potential punishment witnesses.  Lampkin did not answer trial counsel's inquiries regarding his mental health history.

46

Lampkin also did not tell trial counsel that he had taken medication due to his mental health or that he had spent time in a mental health facility. Rather, Lampkin simply said he was "very competent" and "know what I'm doing, I want to defend my rights." Trial counsel said Lampkin treated his questions as an insult. Lampkin never offered any information to his trial counsel to establish that he had been examined for mental health issues. Further, Lampkin never answered counsel's question concerning whether he had ever been on medications for mental health issues.

Counsel gave two explanations for why he decided not to investigate Lampkin's mental health status. First, after further interaction with Lampkin, counsel concluded on his own that Lampkin was competent. Second, Lampkin failed to respond to counsel's questions about his mental health. Because the trial court directly assessed these reasons for reasonableness, we must review the trial court's reasonableness determination.

Because our evaluation of trial counsel's performance "includes a context-dependent consideration of the challenged conduct as seen 'from counsel's perspective at the time,'" *Id.* at 522–23 (quoting *Strickland*, 466 U.S. at 689), we must also consider the nature of this case. As discussed above, the evidence against Lampkin's guilt was strong from the outset. Lampkin's battle was not at the guilt/innocence stage, but at the punishment phase of the trial. Yet, it appears that trial counsel focused on the issue of Lampkin's competency but did not consider whether his mental history might serve to mitigate his punishment. Trial counsel testified that he believed Lampkin had "obsessive compulsive behavior" and that Lampkin would repeatedly ask him to do the same thing. Counsel wrote a letter to Lampkin expressing his "deep[] concern[] about [Lampkin's] mental stability," since "[s]ome of [Lampkin's] actions [were] not the actions of a

47

normal person." Although the letter was ostensibly meant to insult Lampkin and prevent him from sending repetitive letters, counsel admitted that the question of Lampkin's competency was something he seriously thought about and evaluated prior to the trial of this case.

"[A] tactical choice not to pursue one course or another 'should not be confused with the duty to investigate.'" *Bouchillon*, 907 F.2d at 597 (quoting *Beavers v. Balkcom*, 636 F.2d 114, 116 (5th Cir. 1981)). "To do no investigation at all on an issue that not only implicates the accused's only defense, but also his present competency, is not a tactical decision. Tactical decisions must be made in the context of a reasonable amount of investigation, not in a vacuum." *Id.* "It must be a very rare circumstance indeed where a decision not to investigate would be 'reasonable' after counsel has notice of the client's history of mental problems." *Id.*; *see LaHood*, 401 S.W.3d at 52 (citing *Bouchillon* as support for conclusion that failure to investigate was unreasonable and quoting above passage parenthetically); *Freeman v. State*, 167 S.W.3d 114, 119 (Tex. App.—Waco 2005, no pet.) (same); *Conrad v. State*, 77 S.W.3d 424, 426 n.13 (Tex. App.—Fort Worth 2002, pet. ref'd) (same).

Failure to uncover and present mitigating evidence "cannot be justified as a tactical decision when defense counsel has not conducted a thorough investigation of the defendant's background." *Shanklin v. State*, 190 S.W.3d 154, 164 (Tex. App.—Houston [1st Dist.] 2005, pet. dism'd). Counsel had a duty to make a reasonable investigation. Here, the record establishes that trial counsel was concerned about Lampkin's mental health; yet, the record does not reveal any steps taken by counsel to follow up on his concerns.

### b. Whether a Reasonable Attorney Would Have Investigated Further

The reported cases considering this issue lead us to conclude that a reasonable attorney would have investigated further. For example, in *Barnett v. State* (*Barnett II*), we held that trial counsel was not ineffective even though he failed to uncover evidence that the defendant had been diagnosed with bipolar disorder a few months before the assault in question, that he had been treated at a state Mental Health and Mental Retardation (MHMR) facility, and that he "had been recently released from prison after twelve years and could not find employment, . . . experienced depression, sleep disorder, 'problems not eating . . . isolation, agitation, anger, anxiety, crying spells, racing thoughts, [and] feelings of hopelessness/worthlessness.'" *Barnett v. State* (*Barnett II*), 344 S.W.3d 6, 16–18 (Tex. App.—Texarkana 2011, pet. ref'd).[18] Yet, we specifically noted that trial counsel in that case talked to the defendant's mother and hired an investigator who was unable to discover any mitigating evidence. *Id.* at 17–18.

By contrast, in *Freeman*, the Waco Court of Appeals found that trial counsel was ineffective for failing to discover defendant's mental health history, including two prior psychiatric hospitalizations where he was treated "because he reported he was having demons [and] needed help," together with evidence that "he had been receiving outpatient treatment for mental illness on a regular basis for more than a year before the date of the offense." *Freeman*, 167 S.W.3d at 118. At the hearing on defendant's motion for a new trial, trial counsel testified that he had filed a motion to determine defendant's competency because he was having a hard time communicating

---

[18] *See infra* note 25.

with the defendant. *Id.* He also testified that defendant's parents told him he had been under a physician's care and "'had had problems for a number of years'" and that defendant told him he was "'self-medicating his psychosis with crack cocaine.'" *Id.* at 119. The Waco court found that on this record, trial counsel failed to sufficiently investigate the defendant's mental health history and therefore rendered ineffective assistance of counsel. *Id.*

In *LaHood*, the Court of Criminal Appeals found that counsel was ineffective in failing to investigate the appellant's mental health history. *LaHood*, 401 S.W.3d at 45. The Court of Criminal Appeals noted that trial counsel knew that appellant was bipolar and that he was prescribed several psychiatric medications. *Id.* at 51. Also, the appellant had engaged in disruptive behavior at trial, and although trial counsel disputed their testimony, appellant's father and ex-wife testified that they had told counsel of appellant's mental health history. *Id.* The Court of Criminal Appeals ultimately found that the appellant was not prejudiced by trial counsel's failure to investigate his mental health because the appellant did not prove that had she investigated the matter, "that there was a reasonable probability that he would have been found incompetent to stand trial if the issue of competency had been raised and fully considered." *Id.* at 54. Nevertheless, the court did find that trial counsel's failure to investigate that issue was unreasonable. *Id.* at 51–52. Specifically, the Court of Criminal Appeals stated,

> [C]ounsel's belief as to a medical issue is based on her own lay opinion, even though she knew Applicant had mental-health issues in the past and was taking medications that gave him, in her estimation, a "substantial probability of regaining competency." Applicant's medical records from the jail were easily accessible and contained significant information (including evidence of a suicide attempt during the trial) that could have allowed his attorney to assert that he was incompetent. After reviewing the quantum of evidence known to counsel before and during trial, and whether the known evidence would lead a reasonable attorney to investigate

further, we conclude that trial counsel's failure to further investigate was unreasonable under the circumstances.

*Id.*

Finally, in *Conrad*, the Fort Worth Court of Appeals found that trial counsel provided ineffective assistance in failing to investigate the appellant's mental health history. *Conrad*, 77 S.W.3d 424. The court of appeals noted that trial counsel relied on reports from the State's appointed mental health experts who found that appellant was competent to stand trial and that counsel did no further investigation into his client's mental health status. *Id.* at 426. In finding trial counsel ineffective, the court of appeals noted,

> Trial counsel did not discuss the doctors' findings with them, even though he agreed they had been cooperative with him in the past. Trial counsel looked at no medical records regarding Appellant, did not request his own expert, did not contact the Social Security Administration about Appellant's mental illness, did not speak to the attorneys who had represented Appellant in the past, and did not speak with any doctors treating Appellant at the VA hospital. Trial counsel testified that Appellant believed he had no mental problems and did not want a competency examination.

*Id.*

In the present case, trial counsel went to the jail and tried to locate a witness Lampkin had identified—a nephew named Graylon Rowl who went by the street name "Cash." But the jail was unable to locate anyone by that alias. Lampkin also told trial counsel that Rowl's last name was spelled Ral, and trial counsel had the jail search under that name, but they did not find Mr. Rowl. Trial counsel testified, though, that his purpose in trying to locating this witness was to determine if Lampkin had been drinking during the two hours he had been travelling before he was stopped. Accordingly, trial counsel sought this witness for purposes of guilt/innocence issues, not

51

mitigation. There is no evidence that counsel performed any investigation into Lampkin's mental health history.

For instance, there is no evidence that trial counsel hired an investigator or attempted to speak to any of Lampkin's other relatives. Lampkin testified during the punishment phase of trial that he was married, and he identified his wife by name, but the record does not demonstrate that trial counsel ever attempted to talk to Lampkin's wife or any other relative about his concerns over Lampkin's mental health status. Likewise, there is no evidence that trial counsel ever inquired of any jail personnel whether Lampkin was receiving or had received any type of mental health services in the past.

Counsel's reasons for failing to investigate Lampkin's mental health status were (1) that he stopped questioning Lampkin's competency and decided that Lampkin was simply obsessive compulsive after Lampkin claimed that he was competent[19] and (2) that he concluded that Lampkin was competent based on his discussions with him. It appears that once counsel satisfied himself that Lampkin was competent, he never considered whether the characteristics which caused his concerns about Lampkin's competency might lead to the discovery of mitigating evidence. As further explained below, his belief that Lampkin was competent to stand trial was not unreasonable, but it did not absolve him from his duty to investigate potential mitigating evidence.

The present case falls between *Barnett II*, *Freeman*, and *LaHood*. Lampkin's trial counsel did not have the specific information available to him that was available to trial counsel in

---

[19]We note that a defendant's belief as to his own competency does not absolve counsel of the duty to investigate the matter. *Conrad*, 77 S.W.3d at 426.

52

*Freeman*, but he did have specific concerns about Lampkin's mental health status as in *LaHood*. Yet, he did not attempt to contact Lampkin's wife or hire an investigator to assist in investigating possible mitigating evidence as trial counsel did in *Barnett II* and failed to do in *LaHood*. Essentially, trial counsel asked Lampkin whether he had ever received treatment and whether he was taking medication, but when Lampkin became defensive and assured trial counsel he was competent, trial counsel stopped investigating. In that respect, this case is very similar to *Conrad*. While trial counsel has no obligation to investigate every conceivable mitigating lead, he cannot ignore such leads, either. In this case, a reasonable attorney, when presented with the information available to Lampkin's trial counsel, would have further investigated Lampkin's mental health history.

Given counsel's continued concerns about Lampkin's mental health, reasonable professional judgments did not support his choice to limit his investigation of mitigating evidence, despite his belief in Lampkin's competence. *See LaHood*, 401 S.W.3d at 51–52; *Freeman*, 167 S.W.3d at 119–20; *Conrad*, 77 S.W.3d at 426. The information available to trial counsel was sufficient to require further investigation, and under prevailing professional norms, no reasonable attorney would have failed to do so. Thus, the trial court should have found that trial counsel's failure to investigate Lampkin's mental health history for the purpose of uncovering mitigating evidence constituted deficient performance.

**D. Prejudice Arising from Counsel's Failure to Investigate Lampkin's Mental Health Status**

**1. During the Guilt/Innocence Phase of Trial**

Next, in order to meet *Strickland*'s second prong, the prejudice prong, Lampkin was required to show that but for counsel's unprofessional error, there is a reasonable probability that the result of the proceeding would have been different. *See Strickland*, 466 U.S. at 687–88. Trial counsel testified that he would have argued during guilt/innocence that Lampkin's mental retardation negated or diminished his culpability. While diminished capacity is not an affirmative defense, it is a "failure-of-proof defense in which the defendant claims that the State failed to prove that the defendant had the required state of mind at the time of the offense." *Jackson v. State*, 160 S.W.3d 568, 573–74 (Tex. Crim. App. 2005); *see Ruffin v. State*, 270 S.W.3d 586, 593 (Tex. Crim. App. 2008). Focusing on counsel's testimony, Lampkin argues that counsel's ineffective assistance prevented him from employing a diminished capacity defense.

However, no mens rea is required to establish DWI. *See* TEX. PENAL CODE ANN. § 49.04(a); *Sanders v. State*, 936 S.W.2d 436, 437–38 (Tex. App.—Austin 1996, pet. ref'd) (citing *Aguirre v. State*, 928 S.W.2d 759, 759–60 (Tex. App.—Houston [14th Dist.] 1996, no pet.)). Thus, it appears that the trial court could have excluded Lampkin from presenting the evidence of his mental retardation or mental health during guilt/innocence. Accordingly, Lampkin cannot meet the second *Strickland* prong with regard to the guilt/innocence phase of the trial.

## 2. During the Punishment Phase of Trial

Lampkin also argues that counsel's failure to investigate prejudiced him during the punishment phase of trial because it precluded the jury from considering his mental health records for the purpose of mitigating his punishment.

### a. Standard of Review

In evaluating prejudice in this context, we weigh "the evidence in aggravation against the totality of available mitigating evidence" in the entire record. *Wiggins*, 539 U.S. at 534. In conducting this assessment, courts often review the evidence presented during the hearing on the motion for a new trial to see if a proper investigation would have uncovered evidence that could have changed the outcome of the trial. *See Freeman*, 167 S.W.3d at 120; *Conrad*, 77 S.W.3d at 426–27.

Establishing that prejudice occurred during the sentencing phase of a non-capital case where the sentencing authority has broad discretion is a field of law with little guiding precedent.[20] The United States Supreme Court cases addressing *Strickland* prejudice during sentencing involve either death penalty cases or cases decided under the Federal Sentencing Guidelines. Also, few states have sentencing schemes like Texas where the jury determines the sentence and is granted broad discretion in doing so.[21] Yet, a few principles can be discerned from the Supreme Court cases and the few Texas cases which have considered this issue.

---

[20]*See* Carissa Byrne Hessick, *Ineffective Assistance at Sentencing*, 50 B.C. L. REV. 1069 (2009) (discussing and comparing issues associated with establishing prejudice under *Strickland* in mandatory and discretionary sentencing schemes in non-capital cases).

[21]*See* Jenia Iontcheva, *Jury Sentencing As Democratic Practice*, 89 VA. L. REV. 311, 314 (2003) (noting that as of 2003, only six states employed jury sentencing in non-capital cases).

First, even a small increase in a defendant's sentence is prejudicial. In *Glover v. United States*, the Supreme Court held that defense counsel's failure to object to the federal district court's sentencing calculations that resulted in an "unlawful increase of anywhere between 6 and 21 months" to Glover's sentence was prejudicial under *Strickland. Glover v. United States*, 531 U.S. 198, 200, 202 (2001). In reaching this conclusion, the Supreme Court, noting the inherent prejudicial effect of ineffective assistance during the sentencing phase, stated, "[O]ur jurisprudence suggests that any amount of actual jail time has Sixth Amendment significance." *Id.* at 203. However, because the federal sentencing guidelines were mandatory when *Glover* was decided,[22] there was no doubt that "but for counsel's unprofessional errors, the result of the proceeding would have been different," *Strickland*, 466 U.S. at 694, because, assuming the validity of a timely objection, counsel's failure to object directly resulted in the increased sentence.

Second, in a discretionary, non-capital sentencing scheme, it is difficult to demonstrate that an increase actually occurred. In Texas' non-capital sentencing scheme, unlike the federal sentencing framework, there are no guidelines beyond the statutory punishment ranges established by the Legislature. The punishment for a first degree felony in Texas is commitment to the Texas Department of Criminal Justice Correctional Institutions Division (CID) for anywhere from a minimum of five years to a maximum of ninety-nine years or life. TEX. PENAL CODE ANN. § 12.32(a) (West 2011). In Texas criminal proceedings, juries deliberate in secret, TEX. CODE

---

[22]*Glover* was decided under the federal mandatory sentencing guideline scheme in effect at that time under which a trial court had little discretion to deviate from the guidelines. Subsequently, the Supreme Court held that the mandatory federal sentencing guidelines violated the Sixth Amendment. *United States v. Booker*, 543 U.S. 220, 245 (2005). Now, the federal guidelines are advisory. *Id.*

56

CRIM. PROC. ANN. art. 36.215 (West Supp. 2014), art. 3622 (West 2006), and make no written findings other than those contained on a pre-printed, general verdict form provided by the trial court and signed by the presiding juror, TEX. CODE CRIM. PROC. ANN. art. 37.07, § 1(a) (West Supp. 2014). Thus, determining whether counsel's deficient performance prejudiced the defendant during the punishment phase, under Texas' punishment scheme, is difficult given the breadth of the punishment ranges and the lack of information regarding the factors that influenced the sentencing authorities. *See Glover*, 531 U.S. at 230.

Yet, establishing *Strickland* prejudice during the punishment phase of a non-capital trial in Texas is not impossible. Shortly after the Supreme Court decided *Strickland*, the Court of Criminal Appeals held that "with some exceptions not applicable here, *Strickland* clearly requires a showing of prejudice for *all* claims alleging deficient attorney performance primarily because the government is not responsible for and cannot prevent deficient attorney performance." *Hernandez v. State*, 988 S.W.2d 770, 772 (Tex. Crim. App. 1999). In the cases decided since *Hernandez*, whether the Court of Criminal Appeals has found prejudice during the sentencing phase of non-capital cases turned on whether the facts demonstrated prejudice beyond mere conjecture or speculation. Thus, in *Ex parte Rogers*, 369 S.W.3d 858 (Tex. Crim. App. 2012), the court found prejudice because "it would not be 'pure conjecture and speculation' to find that the deficiencies of trial counsel influenced the jury when it assessed the Applicant thirty-five years more than the upper end of punishment requested by defense counsel." *Id.* at 865 (quoting *Ex parte Cash*, 178 S.W.3d 816, 818 (Tex. Crim. App. 2005)). By contrast, in *Ex parte Cash*, 178 S.W.3d 816, 818–19 (Tex. Crim. App. 2005), the court did not find *Strickland* prejudice because "[s]uch a finding

57

in this case would be based on pure conjecture and speculation. *See Strickland*, 466 U.S. at 693 (not enough for a defendant to show that counsel's errors had some conceivable effect on the outcome of the proceeding)."

The Courts of Appeals have applied this standard as well. For example, in an unpublished opinion, *Mack v. State*, No. 06-06-00222-CR, 2007 WL 1435003 (Tex. App.—Texarkana May 17, 2007, no pet.) (mem. op., not designated for publication), we held that even though defense counsel failed to object to incorrect testimony by the State's investigator and incorrect statements by the State during closing arguments regarding the parole eligibility laws, defendant could not show prejudice because the defendant received "a sentence in the middle of the [sentencing] range." *Id.* at *2. We further noted that "[w]e would only be speculating to suggest that the result would have been any different in the absence of the State's objectionable conduct." *Id*. at *2. Likewise, the Dallas Court of Appeals, in an unpublished opinion, *Chapman v. State*, Nos. 05-05-01349-CR, 05-05-00135-CR, 2007 WL 10560 (Tex. App.—Dallas Jan. 3, 2007, no pets.) (not designated for publication), found no prejudice even if it assumed defense counsel's failure to object to inadmissible extraneous-offense evidence offered during the punishment phase, because "[e]ven without any testimony regarding extraneous offenses against Rodriguez and Gonzales, the State established appellant had an extensive record of offenses. . . . Accordingly, one need not resort to speculation about the effect of the extraneous victim impact testimony to explain the jury's assessment of maximum sentences in these cases." *Id*. at *3.[23] Thus, under Texas' discretionary

---

[23]Although these unpublished cases have no precedential value, we may take guidance from them "as an aid in developing reasoning that may be employed." *Carrillo v. State*, 98 S.W.3d 789, 794 (Tex. App.—Amarillo 2003, pet. ref'd).

non-capital punishment scheme, in order for an appellant to prevail on an ineffective assistance of counsel argument resulting from professional errors applicable to the sentencing phase where the jury determined the sentence, the record must demonstrate *Strickland* prejudice beyond mere conjecture and speculation.

Although that standard of review is somewhat vague, the prior Texas cases addressing this issue reveal certain general factors which are important in evaluating whether the standard has been met.[24]  First, while the existence of a maximum sentence is not determinative of whether prejudice is shown, *Rogers*, 369 S.W.3d at 865 (finding that prejudice was not speculative where seventy-five-year sentence was imposed), the fact that a defendant received a maximum sentence is a factor to be considered, *Ex parte Lane*, 303 S.W.3d 702, 719 (Tex. Crim. App. 2009) (finding prejudice where maximum sentence imposed for a non-violent offense).  Similarly, disparity, if any, between the sentence imposed and the sentence(s) requested by the respective parties is a factor to be considered.  *Mack*, 2007 WL 1435003 at *2 (noting that finding of prejudice would require speculation and conjecture because State argued for a maximum sentence, defendant argued for minimum sentence, and jury rendered sentence in middle of punishment range).  Third, the nature of the offense charged and the strength of the evidence presented at trial is a factor. *Chapman*, 2007 WL 10560 at *3 (finding no prejudice where "[t]he present cases were especially egregious because after stealing a police bait car, appellant led officers on a dangerous eighty-mile-per-hour chase through a residential neighborhood on a Saturday afternoon culminating in an

---

[24]These factors are noted in order to resolve the case before us and address only the particular situation presented in this case, i.e., a non-capital case involving the question of *Strickland* prejudice during the punishment phase of trial in which the jury assessed punishment.  We state no opinion about whether they would be applicable or relevant to any other situation.

accident that destroyed the stolen vehicle."). Fourth, the egregiousness of the error—essentially, the relationship between the amount of effort and resources necessary to have prevented the error as compared to the potential harm from that error—has been considered. *Compare Rogers*, 369 S.W.3d at 865 (finding that it was not speculative to conclude that defense counsel's failure to secure and present DNA evidence and defendant's GPS ankle monitor records was prejudicial where counsel knew of existence of that evidence before trial but simply failed to follow up on it, the extraneous-offense evidence was highly inflammatory, and DNA and GPS evidence exonerated defendant of guilt for that extraneous offense) *with Cash*, 178 S.W.3d at 818 (finding it speculative to deem defense counsel's failure to obtain defendant's verification of probation application prejudicial where sentence was thirty years more than maximum permissible for probation eligibility). Finally, the defendant's criminal history has been considered. *See Mack*, 2007 WL 1435003 at *2 (observing that "State presented evidence of 'numerous thefts, resisting arrest, evading arrest, criminal trespass, felony drugs, felony indecency with a child, bond jumping, skipping out, basically a life of crime, as much of a career criminal as you're going to find'").

In cases where the deficient performance involves the failure to investigate mitigating evidence, however, some courts of appeal have found prejudice even when they concluded it was speculative to do so. For example, in *Milburn*, the court held that prejudice was established by counsel's failure to investigate and present mitigating evidence during the punishment phase of trial, "even though it [was] sheer speculation that character witnesses in mitigation would have in fact favorably influenced the jury's assessment of punishment." *Milburn*, 15 S.W.3d at 271. Likewise, in *Freeman*, the court held that defense counsel's failure to investigate defendant's

60

mental health history was prejudicial "'even though it [was] sheer speculation that [evidence of his mental illness and medical history] would have in fact favorably influenced the jury's assessment of punishment.'" *Freeman*, 167 S.W.3d at 121 (footnote omitted) (quoting *Milburn*, 15 S.W.3d at 271). And, in *Barnett v. State* (*Barnett I*), we found that the defendant could potentially demonstrate prejudice during the punishment phase[25] where defense counsel failed to investigate and present evidence that the defendant had "'various mental illnesses, including being bipolar,' and '[had] had treatment at MHMR'" under the reasoning stated by the court in *Freeman*. *Barnett v. State* (*Barnett I*), 338 S.W.3d 680, 686–87 (Tex. App.—Texarkana 2011, order), *pet. ref'd*, 344 S.W.3d 6 (Tex. App.—Texarkana 2011) (citing *Freeman*, 167 S.W.3d at 121).

A strict reading of these cases would suggest that prejudice is established as a matter of law where the basis for the deficient representation is counsel's failure to investigate and introduce mitigating evidence at punishment. The United States Supreme Court has held that where the ineffective assistance rises to the level of a complete denial of counsel, prejudice is presumed, and "'[n]o specific showing of prejudice [is] required' because 'the adversary process itself [is] presumptively unreliable.'" *Roe v. Flores-Ortega*, 528 U.S. 470, 483 (2000) (quoting *United States v. Cronic*, 466 U.S. 648, 659 (1984)). In fact, in *Milburn*, the Court of Criminal Appeals noted that had the trial court not permitted counsel to introduce the mitigating evidence at trial, prejudice would have been presumed and seemed to indicate that failure to investigate and

---

[25]In *Barnett I*, we did not decide whether ineffective assistance of counsel or prejudice had been established, only that the defendant's "motion for new trial and accompanying affidavit [gave] rise to reasonable grounds that could [have entitled] Barnett to relief," and we therefore abated the appeal and remanded the case "to the trial court for a hearing on Barnett's motion for new trial." *Barnett I*, 338 S.W.3d at 687. On remand, the trial court denied the motion for a new trial, and we affirmed the trial court's ruling. *Barnett II*, 344 S.W.3d at 26.

61

introduce mitigating evidence during the punishment phase rises to the level of a "'constructive denial of the assistance of counsel altogether [so that it] is legally presumed to result in prejudice.'" *Milburn*, 15 S.W.3d at 271 (quoting *Strickland*, 466 U.S. at 692).

Yet, the United States Supreme Court has not held that prejudice is presumed when counsel fails to investigate available mitigating evidence under *Wiggins* or *Strickland*, but rather held only that the reviewing court must "reweigh the evidence in aggravation against the totality of available mitigating evidence." *Wiggins*, 539 U.S. at 534. In fact, the United States Supreme Court

> has uniformly found constitutional error without any showing of prejudice when counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceeding.
> Apart from circumstances of that magnitude, however, there is generally no basis for finding a Sixth Amendment violation unless the accused can show how specific errors of counsel undermined the reliability of [the verdict].

*Cronic*, 466 U.S. at 659, nn.25, 26 (citations omitted). Likewise, the Court of Criminal Appeals in *Milburn* noted, "[T]he failure to investigate, interview witnesses, and call witnesses to testify was prejudicial expressly because witnesses existed who could and would have provided testimony favorable to appellant's case. Had that not been established, harm would not have been demonstrated and could not have been presumed." *Milburn*, 15 S.W.3d at 272 (Edelman, J., concurring). Consequently, notwithstanding the Courts' language in these cases, prejudice is not presumed where counsel has failed to investigate and present available mitigating evidence; rather, the appellant must demonstrate prejudice beyond mere conjecture or speculation.

Thus, in reviewing cases where counsel failed to investigate and present mitigating evidence, courts have relied on certain additional factors to determine whether the defendant was prejudiced. For example, the courts have considered whether mitigating evidence was available.

62

*See id.* at 270 (observing that "[t]here were no fewer than twenty witnesses available to testify on appellant's behalf"). The courts have also considered whether the available mitigating evidence was admissible. *Id.* at 271; *see also Wiggins*, 539 U.S. at 537 (noting that "Maryland appears to consider this type of evidence relevant at sentencing"). Further, in *Milburn*, the court observed that "trial counsel presented no evidence of mitigating factors for the jury to balance against the aggravating factors presented by the State." *Milburn*, 15 S.W.3d at 270. Also, the courts have considered the degree of aggravating evidence presented by the State at punishment. *See id.* (finding that mitigating evidence "would have provided some counterweight to evidence of bad character which was in fact received by the jury"; *see also Porter v. McCollum*, 558 U.S. 30, 42 (2009) (per curiam) ("Had the judge and jury been able to place Porter's life history 'on the mitigating side of the scale,' and appropriately reduced the ballast on the aggravating side of the scale, there is clearly a reasonable probability that the advisory jury—and the sentencing judge—'would have struck a different balance.'"). Moreover, the court in *Milburn* noted that "the jury would have considered [the available mitigating evidence] and possibly have been influenced by it." *Milburn*, 15 S.W.3d at 271; *see also Shanklin v. State*, 190 S.W.3d 154, 165–66 (Tex. App.—Houston [1st Dist.] 2005), *pet. dism'd, improvidently granted*, 211 S.W.3d 315 (Tex. Crim. App. 2007). Finally, courts have considered whether and to what extent the proposed mitigating evidence serves to explain the defendant's actions in the charged offense and to assist the jury in determining the defendant's blameworthiness. *See Porter*, 558 U.S. at 41 (holding that defense counsel's failure to present evidence at sentencing of "(1) . . . [defendant's] heroic military service in two of the most critical—and horrific—battles of the Korean War, (2) his struggles to regain

normality upon his return from war, (3) his childhood history of physical abuse, and (4) his brain abnormality, difficulty reading and writing, and limited schooling" was prejudicial because "[t]he judge and jury at [defendant's] original sentencing heard almost nothing that would humanize [defendant] or allow them to accurately gauge his moral culpability").

### b.      Summary of Factors to Consider

In summary, in deciding whether a defendant has established *Strickland* prejudice during the punishment phase of non-capital cases as a result of deficient attorney performance of any kind, the following non-exclusive list of factors are relevant:  (1) whether the defendant received a maximum sentence, (2) the disparity, if any, between the sentence imposed and the sentence(s) requested by the respective parties, (3) the nature of the offense charged and the strength of the evidence presented at the guilt/innocence phase of trial, (4) the egregiousness of counsel's error—essentially, the relationship between the amount of effort and resources necessary to have prevented the error as compared to the potential harm from that error—and (5) the defendant's criminal history.  Where the deficient performance arises from counsel's failure to investigate and introduce mitigating evidence, the following additional factors are also relevant:  (1) whether mitigating evidence was available and, if so, whether the available mitigating evidence was admissible, (2) the nature and degree of other mitigating evidence actually presented to the jury at punishment, (3) the nature and degree of aggravating evidence actually presented to the jury by the State at punishment, (4) whether and to what extent the jury might have been influenced by the mitigating evidence, (5) whether and to what extent the proposed mitigating evidence serves to explain the defendant's actions in the charged offense, and (6) whether and to what extent the

proposed mitigating evidence serves to assist the jury in determining the defendant's blameworthiness.

### c.    Application of the Standard of Review

In the present case, the factors relied upon by courts in determining whether *Strickland* prejudice exists during the punishment phase of a non-capital case weigh in favor of a finding of prejudice in this case.  First, Lampkin received a maximum sentence of ninety-nine years' imprisonment in the CID.  The State argued for a life sentence, whereas Lampkin's counsel did not argue for any particular sentence but merely left it to the jury's discretion.  The offense itself was DWI, which is a non-violent offense, and although its potential for harm is as great as a violent offense, no one was injured in this case.  The State's evidence establishing guilt was strong: Lampkin's blood alcohol concentration two hours after the arrest was over .111, Lampkin's speech was slurred and eyes were bloodshot, four of the six indicators were positive from the HGN Test, Lampkin admitted he had been drinking, and he rated himself a five out of ten on a hypothetical scale of intoxication.  The records substantiating Lampkin's mental status were in the possession of the Texas Department of Criminal Justice and a mental health facility in Dallas to which Lampkin testified he had been admitted previously.  Given counsel's concerns about Lampkin's mental status, the records could have been obtained with a subpoena or a medical authorization by Lampkin.  Thus, the amount of effort and resources necessary to obtain the evidence was minimal.

In addition, substantial mitigating evidence was available.  The jail and medical records were themselves mitigating, and the information contained therein identified other persons who might possess additional mitigating information.  The evidence was also admissible.  Article 37.07

of the Code of Criminal Procedure allows for the introduction by either the State or the defendant

of "any matter the court deems relevant to sentencing." TEX. CODE CRIM. PROC. ANN. art. 37.07,

§ 3(a)(1) (West Supp. 2014). Although Lampkin's best chance for success was at the punishment

phase of the trial, counsel neither presented any mitigating evidence nor called any witnesses to

offer mitigating evidence. On the other hand, the State introduced evidence of Lampkin's

substantial criminal history.[26] The available mitigating evidence was likely to influence the jury

and assist them in assessing the defendant's blameworthiness. "[E]vidence about the defendant's

background and character is relevant because of the belief, long held by this society, that

defendants who commit criminal acts that are attributable to a disadvantaged background . . . may

be less culpable than defendants who have no such excuse." *California v. Brown*, 479 U.S. 538,

---

[26]The State introduced the following evidence of Lampkin's criminal history:

(1)     a June 10, 1986, judgment establishing that Lampkin was convicted of burglary and was sentenced to six years' imprisonment;

(2)     a September 10, 1986, judgment establishing that Lampkin was convicted of burglary and was sentenced to six years' imprisonment;

(3)     a June 15, 1987, judgment establishing that Lampkin was convicted of escape and was sentenced to three years' imprisonment;

(4)     a May 15, 1987, judgment establishing that Lampkin was convicted of unauthorized use of a vehicle and was sentenced to three years' imprisonment;

(5)     a February 10, 1999, judgment revoking community supervision establishing (a) that Lampkin was convicted of DWI, third or more, for an offense that occurred on June 21, 1997, and (b) that he was sentenced to ten years' confinement and was ordered to pay a $2,000.00 fine;

(6)     a February 10, 1999, judgment establishing (a) that Lampkin was convicted of DWI, third or more, for an offense that occurred on December 29, 1998, and (b) that he was sentenced to ten years' confinement and was ordered to pay a $1,000.00 fine;

(7)     a February 10, 1999, judgment revoking community supervision establishing (a) that Lampkin was convicted of failing to stop and render aid after a collision that occurred on November 2, 1992, and (b) that he was sentenced to ten years' imprisonment and was ordered to pay a $1,000.00 fine;

(8)     a February 15, 1999, judgment establishing that Lampkin was convicted of DWI, was sentenced to thirty days' confinement in a state jail facility, and was ordered to pay a $100.00 fine; and

(9)     an April 12, 2006, judgment establishing that Lampkin was convicted of unlawful possession of cocaine, was sentenced to nine months' confinement in a state jail facility, and was ordered to pay a $1,500.00 fine.

545 (1987) (O'Connor, J., concurring) (quoted with approval in *Wiggins*, 539 U.S. at 535). Moreover, the evidence could help explain Lampkin's actions; indeed, counsel argued to the jury that his mental status affected his ability to understand the officers' questions even though there was no evidence in the record to substantiate that argument. The evidence recovered by appellate counsel would have bolstered that argument. Accordingly, we find that the factors relied upon by Texas courts evaluating prejudice in a non-capital case weigh in favor of a finding of prejudice in this case.

#### d.       Trial Counsel's Punishment Strategy

The jury never heard this evidence because counsel did not investigate whether Lampkin's mental health issues—which caused him to question Lampkin's competence to stand trial—might lead to the discovery of available mitigating evidence. Instead, counsel gave the following letter to Lampkin while the jury was deliberating on the issue of guilt/innocence:

> Mr. Esau [sic] Lampkin                          Via Hand Delivery
>
> Re: Jury Deliberations and Punishment phase
>
> Mr. Lampkin,
>
> I have drafted this letter to give to you while the Jury is deliberating your case.
>
> First I would like to discuss the verdict. We will stand and the Judge will read the verdict. I would request that you not make any out burst [sic] upon the reading of the verdict. Should the verdict be Guilty we will need to proceed today to the Punishment phase of trial, and any negative outburst will not help us with the Jury.
>
> Should the verdict be Not Guilty, we still have to deal with the case with the truck and we still have to work with these Prosecutors and this Judge on that case.
>
> Should the verdict be Guilty I will need to call you to take the stand. I will ask you about your family and your job. I will ask you about your prior criminal

67

convictions. Once I am done asking you questions the State will ask you some questions. There are about three answers that you need to give to the State.

1.      I accept responsibility for what I have done.
2.      I thought that I was not intoxicated, I respect the Jury's verdict.
3.      I would request an opportunity to change.
4.      I paid my debt to society and I am ready to move on with my life.

Do not make any negative statements to the Jury.

If they ask you about the truck, plea the 5th.

You come off very well when you want to. The pictures of you and your pretty wife will go a long way towards a minimal sentence from the Jury.

Counsel explained, "My strategy was, is for him to show the jury the best side of himself so that they might take mercy upon him and not punish him based solely on a cold black-and-white record."

Lampkin's substantial criminal history increased his need for mitigating evidence and further demonstrates that trial counsel's failure to investigate his mental health history was prejudicial. The mental health records, which contained the only possible mitigating evidence, demonstrated that Lampkin had been homeless and impoverished, had diminished capacity, suffered from psychotic delusions and major depressive disorder, had attempted suicide, and had a long history of drug abuse. This is "the kind of troubled history . . . relevant to assessing a defendant's moral culpability." *Wiggins*, 539 U.S. at 535. In addition to using Lampkin's mental health and social health history to cast a better light on Lampkin's previous convictions, the evidence could have softened the jury's reaction to the recording of Lampkin's rants and threats against Dean.

### e.        The Trial Court's Analysis

The trial court, however, looked at the mitigating evidence produced at the motion for a new trial hearing and determined that no prejudice existed because the information could have negatively affected the jury's view of Lampkin. The trial court stated,

> As to not asking for these records. Even if he had had these records, while it could be argued they may have helped and provided sympathy for Mr. Lampkin, looking at the back of some of these records also shows -- it could be easily argued, with all the requests and complaints that Mr. Lampkin had while in prison, that he was a malcontent or malingerer or other things that could actually have hurt Mr. Lampkin, had he gone -- had these records been introduced in front of a jury.

In *Wiggins*, the Supreme Court noted that a court may consider the potential negative effects of available mitigating evidence in deciding whether the defendant was prejudiced by counsel's failure to investigate:

> [G]iven the strength of the available evidence, a reasonable attorney might well have chosen to prioritize the mitigation case over the direct responsibility challenge, particularly given that Wiggins' history contained little of the double edge we have found to justify limited investigations in other cases.

*Id.* Nevertheless, in the cases where that consideration was approved, the attorney knew about the evidence, made an initial investigation into the information, and then made a strategic decision not to investigate further or use the information at trial. *See Burger v. Kemp*, 483 U.S. 776, 794–95 (1987) ("It appears that [counsel] did interview all potential witnesses who had been called to his attention and that there was a reasonable basis for his strategic decision that an explanation of petitioner's history would not have minimized the risk of the death penalty. Having made this judgment, he reasonably determined that he need not undertake further investigation to locate witnesses who would make statements about Burger's past."); *see also Darden v. Wainwright*, 477

69

U.S. 168, 186 (1986) (where Supreme Court approved defense counsel's decision not to use psychiatric report obtained on defendant because using defense's psychiatric evidence would invite rebuttal by State, which had a psychiatric report indicating petitioner "very well could have committed the crime; that he was . . . sociopathic type personality; that he would act entirely on impulse with no premeditation from the standpoint of planning").

By contrast, in this case, counsel did not know about the available mitigating evidence because he did not investigate the matter. Therefore, he did not make a strategic decision not to investigate further or not to use it at trial. Utilizing the potential harm analysis under these circumstances would not amount to a deferral to the considered strategic decisions of counsel; rather, it would be making a strategic decision for counsel based on information neither obtained nor considered by counsel. Consequently, the potential harm analysis authorized in *Wiggins* is not applicable here.

"The sentencing process consists of weighing mitigating and aggravating factors, and making adjustments in the severity of the sentence consistent with this calculus." *Milburn*, 15 S.W.3d at 270. Because trial counsel performed no investigation into any possible mental health or other mitigating factors, he presented no mitigating evidence for the jury to balance against the aggravating factors presented by the State. Instead, he encouraged Lampkin to testify at punishment, a choice he may not have made had mitigating evidence been properly uncovered. We find that absent counsel's unprofessional error, Lampkin's mental health records would have been available for the jury to review, and these records could have shed a different light on Lampkin's prior convictions. Thus, we conclude beyond speculation or conjecture that a

reasonable probability exists that Lampkin's sentence would have been less severe had the mitigating evidence been presented and that the trial court erred in finding otherwise. *See Freeman*, 167 S.W.3d at 121. Accordingly, we sustain this point of error.[27]

## V.    Conclusion

We affirm the trial court's judgment on defendant's guilt, but reverse the trial court's judgment and remand the case to the trial court for a new trial on punishment only.[28]


Ralph K. Burgess
Justice

Date Submitted:      April 1, 2015
Date Decided:        August 11, 2015

Publish

---

[27]Because our decision that Lampkin is entitled to a new trial on punishment is dispositive of the remaining grounds of ineffective assistance, we will not address them.

[28]During oral argument, Lampkin also noted that the trial court's judgment ordered Lampkin to pay attorney fees for his court-appointed counsel. Because Lampkin will receive a new trial on punishment, we need not address whether this record demonstrated that Lampkin had the ability to pay the assessed attorney fees.

# APPENDIX

Some of the observations gathered from Lampkin's voluminous mental health records introduced at the hearing on Lampkin's motion for a new trial are listed below in chronological order.

- **5/30/07 Metrocare TIMA Note**: Lampkin "denies voices no paranoia. . . . No psych. treatment before."

- **3/3/08 Texas Department of Criminal Justice (TDCJ) Diagnostic Screening** Interview: Lampkin reported that he had been treated by MHMR for anxiety due to stress and had been prescribed Trazodone by a psychiatrist for mental and emotional problems. According to this document, Lampkin reported that he completed the ninth grade and said he was never in special education. However, the interviewer's notes said that Lampkin originally identified the date as March of 2004 instead of March 2008. Thus, Lampkin was scheduled for a clinical interview.

- **3/28/2008 Correctional Managed Care (CMC) Intake History and Health** Screening: This document states that Lampkin reported a previous suicide attempt, but that he had no diagnosed mental illness. The document suggests that Lampkin had normal speech, appropriate attitude, and did not see or hear things.

- **4/10/2008 CMC Outpatient Mental Health Services Report**: This document states that Lampkin was referred for a Mental Health Evaluation on 4/10/2008 because he scored a 66 on the Beta I.Q. test. According to this report, Lampkin's evaluation said he was "oriented in all spheres," was cooperative, had normal rate and modulation of speech, and had no psychotic indices. However, Lampkin also had poor insight and judgment, weak memory, and in terms of intelligence was "[w]ell below average." The report said that "most likely he is mentally retarded" and that "[h]e only scored a 1 on the ABST, and he was deficient in basic skills like telling time and counting change." The report, signed electronically signed by Douglas J. Duncan, MS, LPC, and Mary K. Whitley, MA, LPA, RP, listed that the diagnostic impression was "Mild Mental Retardation (Probable)." Lampkin was transferred to MROP for further evaluation.

- **5/6/2008**: Lampkin pens a grievance complaining that he has "not been able to receive adaqute [sic] medical care [because] the medical doctors officials [have been] deliberately indifferent" to his arthritic condition.

- **5/7/2008 CMC Clinic Notes**: This nursing note suggests that Lampkin was exaggerating symptoms of joint pain in order to obtain a transfer from a top bunk to a bottom bunk. The note said, "IT IS VERY CLEAR HE IS HERE FOR A BOTTOM BUNK ONLY. OFFENDER SITS AND WALKS WITH EASE."

72

- **7/22/08 TDCJ Clinic Note**: This note establishes that Lampkin was again seeking a top bunk assignment. The note states that Lampkin is "more worried about being on the top bunk than anything else."

- **11/26/2008 Incoming MROP Mental Health Screening**: This screening states, "Client reports receiving treatment for anxiety from MHMR in Dallas in 2007. Client reports receiving Trazadone. Client was not receiving psych. meds in county. No MH history from prior incarcerations." During this screening, Lampkin reported that he attended school until ninth grade.

- **12/8/08 CMC MROP Clinic Note**: This note states, "Client reported he was wanting in school and wrote a grievance due to no[t] being placed in one. The DMR process was explained to him and he was informed that once he is admitted into the MROP he would be placed in educational class. It was also explained that that would be based on his Psychological testing that will take place in about 3 weeks."

- **12/8/2008 CMC MROP Clinic Note**: This note documents a report by Lampkin claiming that he has dyslexia and cannot spell very well.

- **12/15/08 CMC MROP Clinic Note**: This note states that Lampkin "is wanting to get into the program here so he can go to school." Lampkin stated, "I want to better myself. I try on test but I blank out." According to the note, Lampkin "was informed that he just needs to be honest and do the best he can when he takes his psychological test."

- **12/18/2008 Mental Health Services MROP Determination of Mental Retardation**: The evaluation states that Lampkin was referred for a Comprehensive Diagnosis and Evaluation to "determine [Lampkin's] intellectual and adaptive functioning," "determine if he meets criteria for mental retardation, assess any needs, [] make recommendations to address identified needs," and to "determine eligibility for the Mentally Retarded Offender Program (MROP)." According to the evaluation, Lampkin reported, (1) that the "[l]ast grade completed was 7th grade due to 'getting into trouble all the time . . . doing drugs,'" (2) that he was in special education classes and "'never understood why [his] brother (twin) was smarter than [him],'" (3) that he had been in and out of jail all of his life, (4) that he never lived alone or had a credit card, (5) that he had not held a job for longer than two months, and (6) that he had an "severe substance abuse history." Although he had never been in a state hospital and was not currently on psychiatric medications, Lampkin "report[ed] seeing a psychiatrist in the past at MHMR in Lancaster." The evaluation continued, "Logical thought process and adequate judgment and insight are displayed. . . . [Lampkin] begins assessment by exaggerating symptoms of mental retardation but when confronted begins displaying an adequate amount of effort to answer questions truthfully. [Lampkin] scored a 4/15 on the ABST and a 73 on the Toni-3 (form B). It appears most of [Lampkin]'s deficits are in activities of daily living due to severe substance abuse

73

history and not from psychiatric issues." The evaluation concluded, "Based on the mental status and test results, the [Lampkin's] intellectual level is concluded to be in the Borderline Range. . . . Considering current evaluation, it is recommended that this offender be accepted in the MRPO, however, more information/investigation is needed to determine appropriateness."

- **1/12/2009 CMC MROP Clinic Note**: This note stated, "[Lampkin] is able to discuss the policies of the unit and possible alternatives that may also be beneficial. [H]e is fairly concrete but is able to plan and predict future outcomes. He is already aware of his resources and how to use them. He comes with prepared questions to discuss with his worker for feasibility. . . . overall functioning appears to be good with only little assistance related to release."

- **2/9/9 CMC MROP Clinic Note**: This note stated, "review of records indicates this inmate has (by his own self report) a history of using highly addictive drugs daily in the free world. He has had mental health treatment prior to his incarceration. He displays symptoms that may be consistent with long term substance use/abuse, mental health symptoms, intellectual problems, antisocial personality disorder."

- **3/9/2009 CMC MROP Clinic Note**: This note stated that Lampkin had good memory, spoke clearly and logically, and was task oriented. However, in the "intellectual functioning" category, Lampkin "need[ed] reexplaining and reeducation" and had "no change."

- **3/23/2009 Correctional Managed Care MROP Mental Health Services Individual Habilitation Plan**: This report indicated that Lampkin had borderline intellectual functioning, but no mental health history of psychiatric treatment, although he reported "MH treatment in Lancaster." According to the plan, the staff was to observe Lampkin's interactions, review his intellectual functioning, and monitor him for appropriateness. The plan indicated that Lampkin requested to go to school. Noting his long history of substance abuse, the plan stated, "DMR suggests that his deficits are related to substance abuse damage," and concluded with the note, "will monitor further for information to support or eliminate need for unit services."

- **4/5/2009 CMC MROP Clinic Note**: This note says "no new or significant problems [were] reported and none [were] observed." The report is that Lampkin's mental health is stable.

- **6/17/2009 CMC MROP Clinic Note**: This report stated that Lampkin had no psychological symptoms or suicidal thoughts and exhibited appropriate mood. The report also stated that Lampkin had "Borderline Intellectual Functioning," but was "Functioning well."

- **6/29/2009 CMC MROP Clinic Note**: This note also stated that Lampkin had "Borderline Intellectual Functioning," but was "Functioning well."

74

- **7/7/09 Medical and Mental Health Transfer Screening**: The screening classified Lampkin as oriented and alert.
- **7/21/2009 Metrocare MH Case Management Note**: According to this note, Lampkin "completed the 8th grade only," and had "mild MR per prison records."
- **9/28/09 Metrocare MH Progress Note**: This note stated that Lampkin "needs education on his mental illness and understanding that the voices telling hi[m] to do drugs are a part of his mental illness." It added that Lampkin "wants to transfer to The Bridge."
- **10/28/09 and 11/11/09 MetroCare MH Med Check Notes**: Both notes reported that Lampkin was adequately groomed, cooperative, had "No Sign of Psychotic Features" or delusions, and exhibited normal speech. The notes also stated that Lampkin was oriented, and displayed fair insight, fair judgment, and fair impulse control, but that his memory was not intact and his attention was impaired.
- **12/15/09 Metrocare MH Nursing Note**: This note reported that Lampkin hears voices.
- **12/15/09 Metrocare MH Med Check Note**: According to this note, Lampkin said, "I think people talk about me. [My] [v]oices say [I] can't and some say [I] can do better for [my]self. Some say it is not worth living. Jump over the bridge." The note concluded that Lampkin was moderately depressed, that his memory was not intact, and that he heard "voices to kill himself."
- **1/25/10 Metrocare MH Med Check Note**: This note demonstrated that Lampkin is taking medication for paranoia.
- **1/25/10 Metrocare MH Progress Note**: This note stated that Lampkin has "paranoia and [is] hearing voices."
- **1/30/10 Metrocare MH Progress Note**: According to this note, Lampkin "report[ed] that his MI started upon his last admittal [sic] into prison in 2009." The note also points out that Lampkin "had trouble filling out [a] form," which showed that he may have "some cognitive limitation."
- **2/5/10 Metrocare MH Med Check Note**: According to this note, Lampkin was "[r]eport[ing] psychosis." The conclusion that was Lampkin had "MDD with psychotic features."
- **2/13/10 Metrocare MH Progress Note**: This note said that Lampkin "has been diagnosed with narrow disc space, degenerative discs, osteoarthritis, and vertebral spurring in the lumbar region."
- **2/20/10 Metrocare MH Progress Note**: This note said that Lampkin was "being extremely compliant and participatory" even though he "is somewhat simple in his cognition d/t a learning disability."
- **4/13/10 Metrocare MH Med Check Note**: This note said that Lampkin was paranoid and reported psychosis.
- **6/8/10 Metrocare MH Med Check Note**: The note stated that Lampkin is taking medicine for paranoia.

- **6/08/10 Dallas Metro Care NorthStar Outpatient Authorization Tools and Treatment Plan**: This plan establishes that Lampkin was diagnosed with a major depressive disorder with psychotic features, and that he had a history of alcohol and cocaine. The note continued, "client reports a nearly-complete remission of sxs since adhering to medication, group, and individual Ml tx. Sleeps well, reports good concentration and social desire, and no significant manic or schizoid sxs." According to the note, Lampkin had "1 to 3 psychiatric-related hospitalizations in the past two years. . . .[and] was in the mental ward of [the] prison ("Hodge Unit") in Rusk, TX in 2009."

- **6/15/10 Metrocare MH Social Security Evaluation**: The evaluation reported that Lampkin was paranoid, and suffered from mood disturbance, retardation, confusion, delusions, anger, and mental impairments.

- **7/7/10 Metrocare MH Progress Note**: This suggested that Lampkin appealed the denial of social security disability benefits. It stated,

  > We arrived on time and spent time in prep with the lawyer, who advised [Lampkin] on how to phrase his answers so the judge will best understand them. [Lampkin] was very anxious before the hearing. I stayed in the waiting room while the hearing took place.
  >
  > When they came out, [Lampkin] looked very disappointed. We debriefed with the lawyer. According to the lawyer, the judge started by asking questions about [Lampkin]'s criminal history, which got him very agitated and confused. She then moved on to pick at one line out of a medical record where a doctor performing a mental status exam found that [Lampkin] couldn't tell the difference between a floor and a wall. The judge said that meant that [Lampkin] is faking his disability, since he can clearly tell the difference between a floor and a wall. [Lampkin] got upset that the judge wasn't looking at his medical records, and the lawyer even spoke out of turn by presenting evidence for an MR diagnosis when she wasn't asked for it. The judge ordered an IQ test to be performed by a SSA doc, and then the hearing can continue. . . . limited cognition does not display in may situations but he is easily frustrated and confused by direct questions.

- **8/3/2010 Metrocare MH Med Check Note**: This note said that Lampkin had "MDD with psychotic features v. schizophrenia and limited intell fx." This note said that Lampkin had an August 4, 2010, "appointment with Dr. Brix tomorrow for a mental evaluation for SSA" to address "undiagnosed MR."[29]

---

[29]Dr. Brix' mental evaluation was not included in the appellate record. In fact, there does not appear to be any record of Lampkin's mental status after this date.